Hunt v. Gibson.

---

No. 20,795.

C. N. HUNT, Plaintiff, v. O. S. GIBSON, Defendant.

SYLLABUS BY THE COURT.

1. QUO WARRANTO—Promise of Candidate to Appoint Electors to Office —Bribery. Conversations occurring before an election between a candidate for office and persons qualified to vote at the election considered, and held to have the effect of bribery by means of promises to appoint the electors to office in case the candidate was successful at the election.

2. SAME—Bribed Votes—Not Counted. The candidate referred to received the certificate of election. His opponent brings this action of quo warranto to determine his right to the office. Held, the votes of the electors referred to, which were cast in the defendant's favor, can not be counted.

3. SAME—Illegal Promises Communicated to Third Persons—Votes Not Counted. The promises referred to were communicated to third persons, who voted for the defendant because of such promises. Held, the votes of such persons can not be counted.

4. SAME—Plaintiff Entitled to the Office. Deducting the void votes from the total number received by the defendant, the plaintiff had a majority of those cast at the election. Held, the plaintiff was elected and is entitled to the office and its privileges and emoluments.

Original proceeding in quo warranto. Opinion filed December 9, 1916. Judgment for plaintiff.

*Ed. J. Fleming, W. L. Cunningham,* and *H. S. Hines,* all of Arkansas City, for the plaintiff.

*Albert Faulconer, C. Ward Wright,* and *L. C. Brown,* all of Arkansas City, for the defendant.

The opinion of the court was delivered by

BURCH, J : The action is one of quo warranto to try the title to the office of mayor of the city of Arkansas City.

The plaintiff and the defendant were opposing candidates at the election held in April, 1916. The defendant received the certificate of election. The petition charged that a sufficient number of votes to change the result should not be counted for the defendant, for reasons which were stated. The court appointed Hon. T. A. Noftzger, of Wichita, as commissioner to take the testimony and report findings of fact and conclusions of law. The commissioner's report follows:

### "FINDINGS OF FACT.

#### "FIRST.

"Arkansas City, a city of the second class, had adopted the commission form of government. A Mayor was to be elected for the city in April, 1916, and for the purpose of selecting a candidate, a primary election was duly held, at which the plaintiff and defendant, who were both eligible to hold the office, were chosen for candidates for Mayor.

#### "SECOND.

"The returns, from the city election duly and regularly held on April 4th, 1916, duly and legally made, showed that the defendant received 1250 votes and the plaintiff 1240 votes. The defendant received his certificate of election, duly qualified as Mayor, assumed the duties of the office on April 17, 1916, and has ever since performed them, and has been receiving the salary pertaining to the office which is One Thousand Dollars a year, payable monthly.

#### "THIRD.

"The city of Arkansas City has never had an ordinance providing for election contests.

#### "FOURTH.

"G. W. Branine was a legal and qualified elector of Arkansas City on April 4, 1916, and entitled to vote for Mayor at the election held on that day. The defendant made such representations to him that under the circumstances he believed, and was entitled to believe, the defendant

Hunt v. Gibson.

would appint him Police Judge of Arkansas City if the defendant shoulc be elected Mayor, and on this account Branine worked and voted for the defendant at the election. (Abstract, pages 15, 16, 157-164, 166-168, 182, 183, 194, 195, 204, 213, 214, 218 and 219.)

"FIFTH.

"Mose Branine and Roy Branine, who are sons of G. W. Branine, and Mrs. Mose Branine and Mrs. Roy Branine, who are daughters-in-law of G. W. Branine, were legal and qualified electors of Arkansas City on April 4, 1916, and were entitled to vote for Mayor at the election held on that day and they voted for the defendant for mayor because they were informed and believed that G. W. Branine had been promised the office of Police Judge by the defendant, and if it had not been for the belief that this promise had been made, and carried out, they would not have voted for the defendant. (Abstract, pages 15-19.)

"SIXTH.

"C. F. Betts, Sr., was a legal and qualified elector of Arkansas City on April 4, 1916, and entitled to vote for Mayor at the election held on that day, voted for the defendant because the defendant promised to appoint him Chief of Police of Arkansas City if the defendant should be elected Mayor. (Abstract, pages 49-102, 143, 144, 151-166, 170, 171, 174-182, 192-194, 200-203, 212, 213 and 219.)

"SEVENTH.

"Mrs. C. F. Betts, Sr., was the wife, C. F. Betts, Jr., was the son, and Mrs. C. F. Betts, Jr., was the daughter-in-law of C. F. Betts, Sr. They were legal and qualified electors of Arkansas City on April 4, 1916, and entitled to vote for Mayor at the election held on that day, and they voted for the defendant by reason of the promise which the defendant had made to C. F. Betts, Sr., to appoint the latter Chief of Police of Arkansas City if the defendant should be elected. (Abstract, pages 82-94, 98, 99, 177.)

"EIGHTH.

"C. C. Patterson was a legal and qualified elector of Arkansas City on April 4, 1916, and entitled to vote for Mayor at the election held on that day, and voted for the defendant because he was informed and believed that the defendant would appoint C. F. Betts, Sr., Chief of Police, and because he was a friend of C. F. Betts, Sr., and desired to assist him in his obtaining this office. (Abstract, pages 99-101.)

"NINTH.

"Elmer Wright was a legal and qualified elector of Arkansas City on April 4, 1916, and was entitled to vote for Mayor at the election held on that day, and was a friend and supporter of the defendant. He did not intend to be present and would not have been present at the election held at Arkansas City April 4, 1916, if the defendant had not promised to appoint him to an office if the defendant should be elected Mayor. By reason of this promise on the part of the defendant Elmer Wright, who intended to be away from Arkansas City at the time of the election, re-

mained and attended the election and voted for the defendant. (Abstract, pages 102-110, 180-190, 204 and 205.)

### "TENTH.

"Ora J. Wilkinson was a legal and qualified elector of Arkansas City on April 4, 1916, and entitled to vote for Mayor at the election held on that day and voted for the defendant at the request of Elmer Wright because he was under obligations to Elmer Wright and was informed and believed that the election of the defendant would be. to Wright's interest. (Abstract, pages 110 and 111.)

### "ELEVENTH.

"W. F. Richards and Mrs. W. F. Richards, his wife, who were legal and qualified electors of Arkansas City on April 4, 1916, and entitled to vote for Mayor at the election held on that day, voted for the defendant because the latter had promised them that he would retain one Willis White in office as Police Judge of Arkansas City. (Abstract, pages 116-120, 205, and 206.)

### "TWELFTH.

"The plaintiff has not proven by a preponderance of the evidence that the vote of any other person other than those above named, was influenced in favor of the defendant by any promise made directly or indirectly by the defendant.

## "CONCLUSIONS OF LAW.

### "FIRST.

"The votes of G. W. Branine and C. F. Betts, Sr., must be deducted from the votes received by the defendant as shown by the returns because these votes were directly the result of illegal promises.

### "SECOND.

"The votes of Mose Branine, Roy Branine, Mrs. Mose Branine, Mrs. Roy Branine, Mrs. C. F. Betts, Sr., C. F. Betts, Jr., and Mrs. C. F. Betts Jr., should be deducted from the votes cast for the defendant. These votes were procured indirectly by legal or illegal promises made by the defendant, and these voters all had a direct interest in the promises.

### "THIRD.

"The vote of C. C. Patterson should be deducted from the votes cast for the defendant because it was directly procured by reason of an illegal promise made to C. F. Betts, Sr. The defendant is not entitled legally to any benefit derived directly from that promise.

### "FOURTH.

"The vote of Elmer Wright should be deducted from the votes cast for the defendant because he would not have voted for the defendant if it had not been for an illegal promise.

### "FIFTH.

"The vote of Ora J. Wilkinson should not be deducted from the votes received by the defendant because while he believed that Elmer Wright would be benefited by the election of the defendant, he did not cast his

Hunt v. Gibson.

vote on account of the knowledge of any illegal promise made by the defendant nor really because of any illegal promise made by the defendant merely to procure the attendance of Elmer Wright at the election. The latter was in favor of the election of Gibson at all times and no promise that Gibson had made him influenced his vote. He did not procure Wilkinson to vote for the defendant on account of any illegal promise.

"SIXTH.

"The votes of W. F. Richards and his wife should not be deducted from the votes cast for the defendant because it was not illegal for the defendant to promise them that he would retain Willis White in office as Police Judge of Arkansas City, as they had no particular interest in Willis White except as a friend or that interest which might arise out of their desire to have a good Police Judge. It was not improper for the defendant to state his views on that question which was one of the legitimate questions involved in the campaign for Mayor.

"SEVENTH.

"I find therefore, that eleven (11) votes should be deducted from the votes cast for the defendant, and the plaintiff adjudged elected Mayor of Arkansas City. He is entitled to the office and its salary."

Each party challenges the findings of fact and conclusions of law adverse to him. If those which are adverse to the defendant be approved they determine the case. Being challenged, the commissioner's findings are advisory only. In the solution of doubtful questions of fact, some weight may be given them because the commissioner had the advantage of personal observation of the witnesses while they were undergoing examination. With this exception the court considers the evidence as though it had been taken by deposition.

The fourth finding of fact is challenged, and the challenge raises the question of what was said in a conversation between the defendant and G. W. Branine, in which the appointment of Branine as police judge in case the defendant were elected was discussed. In the course of Branine's testimony different versions of the conversation may be found, some much stronger than others, against the defendant. Portions of Branine's cross-examination, considered alone, would indicate that the substance of the defendant's statement was, "If I am elected, why, you come and see me." Other evidence corroborates this view. There was circumstantial evidence tending to show that no promise whatever was made, and the defendant gave an account of the conversation which not only exculpated himself, but negatived use of any of the various expressions at-

tributed to him. To debate the question at length would unduly extend this opinion, and would serve no beneficial purpose. The court is satisfied that Branine favored the plaintiff's candidacy, and made the fact clear to the defendant; that Branine solicited a promise of appointment as police judge in the event the defendant was elected; and that in this instance, as in other instances disclosed by the evidence, the defendant undertook to secure votes and work for his election by the use of equivocal language, which would satisfy the person desiring appointment and secure the results which the defendant desired, but which would leave a margin for denying any "engagement," "contract," or "agreement." Branine's first recital of what the defendant said probably included a conclusion with respect to the effect of what was said. At the outset of his cross-examination he was startled, and for some time was disturbed, by being bluntly confronted with the proposition that he had sold his vote. The substance of the conversation is of course all that is material, and the court believes the defendant responded to Branine's solicitation in terms approximately summarized in the following version of the conversation:

"Q. Did Mr. Gibson in that conversation use this language in substance, "If I am elected I will give you the office of Police Judge'? A. Well, he said—I asked him for it.

"Q. Yes, and what did he say? A. He said, 'If you will work for me and vote for me, that's all right; and if I am elected Mayor, why, you come and see me.' "

The ninth finding of fact is challenged. The court accepts the following testimony of Elmer Wright as substantially accurate and substantially true:

"A. Well, I would have to say that I judge about a week, yes about a week, before election, he heard I was going away and he said, 'Mr. Wright, I learn you are going away,' and I said 'Yes.' He said, 'Mr. Wright, you are one of the best workers I got; I can't afford to have you go away. You understand now, the law don't allow me to make any promises; that's the only reason why I can't give you a job right now, understand,' he says, 'I want you to stay and work for me.'

"Q. Did you say whether you would stay or not? A. I believe he said, 'I want you to promise me and say that you will stay until after this election, for it's going to be a close fight and I need your support.'

"Q. And did you stay? A. I did.

"Q. You had intended going away? A. I had.

Hunt v. Gibson.

"Q. And did you vote for Mr. Gibson in that election for Mayor. A. I did.

. . . . . . . . . . . . .

"Q. When you were talking to him about going away, did you tell him why you were going? A. I did.

"Q. Then he said you were one of his best workers? A. Yes.

"Q. What else was said there? A. I was one of his best workers and he could n't afford to have me go, and 'You understand,' he said, 'the law don't allow me to make promises, understand me, Elmer, is the only reason why I can't promise you a job right now.'

"Q. You understood by that that he would get you some position or place, if he was successful, and you stayed and worked for him? A. Well, it left that impression.

"Q. You felt that way about it? A. I did.

"Q. And relied upon it? A. Yes.

"Q. And by reason of that you stayed, when otherwise you would have gone away? A. Yes.

. . . . . . . . . . . . .

"Q. Was there anything said there about his having any jobs or appointments to make? A. He did.

"Q. What did he say about that? A. He said in the conversation—don't know whether it came before or after—he said he would have several good jobs after election."

In this instance the defendant was the moving party. He sought the voter and procured the voter to change his plans, remain in Arkansas City, and vote and work for the defendant, by assurances of appointment to office, not a whit less clear and definite to the understanding because of the protest that the law permitted no promise to be made.

Other findings of fact adverse to the defendant are sustained by the weight of the evidence.

Section 6 of article 5 of the constitution reads as follows:

"Every person who shall have given or offered a bribe to procure his election shall be disqualified from holding office during the term for which he may have been elected."

The crimes act contains the following provisions:

"If any person shall directly or indirectly give or procure to be given, or engage to give, any money, gift or reward, or any office, place or employment, upon any engagement, contract or agreement that the person to whom, or to whose use, or on whose behalf such gift or promise shall be made, shall by himself or any other, procure, or endeavor to procure, the election of any person to any office, at any election by the electors, or any public body, under the constitution or laws of this state, the person so offending shall on conviction be adjudged guilty of bribery.

and punished by imprisonment and hard labor for a term not exceeding
five years.

"If any person, by himself or any person employed by him, shall, by
gift or reward, office or employment, or by any promise, agreement or
security therefor, corrupt or procure or attempt to corrupt or procure
any person who shall have or claim to have a right to vote at any elec-
tion, to give or forbear to give his vote at such election, the person so
offending shall on conviction be adjudged guilty of bribery, and punished
as in the next preceding section is prescribed." (Gen. Stat. 1909,
§§ 2688, 2689.)

The corrupt practices act contains the following provision:

"Any person who shall directly or indirectly give or procure to be
given or promise to give any money, gift or reward, or any office, place
or employment, upon any engagement, contract, agreement or under-
standing that the person to whom or for whose benefit such gift or
promise shall be made, shall, by himself or any other person, procure or
endeavor to procure or work for the election of any person to any public
office at any election, shall be punished by a fine of not less than one
hundred dollars nor more than one thousand dollars, or by imprisonment
in the penitentiary for not more than two years, or both." (Gen. Stat.
1909, § 3283.)

Other statutory provisions deal in similar manner with
other branches of the same general subject, and there can be
no doubt respecting the public policy of this state with refer-
ence to the giving or promising of money, property, office, em-
ployment, or other reward or thing of value, to influence elec-
tors in the exercise of their franchise. The books are full of
homilies which have been delivered by the courts on this sub-
ject. It is not necessary to indite a new one. This court has
already expressed itself, and it will be sufficient for present
purposes to bring forward some extracts from the opinion,
prepared by Mr. Justice Brewer, in the case of *The State v.*
*Elting,* 29 Kan. 397:

"That a purchased vote given for an individual candidate for office
is not to be counted, is conceded. So also that a candidate for office who
purchases a vote therefor is not to have the office, is also beyond ques-
tion. . . . As a consequence of these rules it has been held, that a
candidate for an office to which is attached a fixed salary, who offers to
the electors to discharge, if elected, the duties of such office at less than
the stated salary, is not entitled to have counted for him any votes given
in consideration of such promise. [Citing cases.] . . . In the case
from 36 Wis., [*The State, ex rel., v. Purdy,* 36 Wis. 213] the court,
after referring to a number of authorities, uses this language:

" 'The doctrine which we think is established by the foregoing author-
ities, and which we believe to be sound in principle, is, that a vote given

Hunt v. Gibson.

for a candidate for a public office in consideration of his promise, in case he shall be elected, to donate a sum of money or other valuable thing to a third party, whether such party be an individual, a county, or any other corporation, is void.'

"We have no doubt of the correctness of this doctrine; and in view of the fact that the great danger which now lies in the path of free institutions is the use of money in elections, the scope of this healthful. doctrine should in no manner be limited or abridged by the courts. The purity of the ballot-box should be insisted upon at all times and in all places. Only in that way can be upheld and maintained the integrity, and therefore the permanence, of popular government. . . . When a candidate gives an elector personally money or property, there is a direct attempt to influence his vote by pecuniary considerations. The expectation is that such vote will be controlled, not by the elector's judgment of the fitness of the candidate for the office, but by the pecuniary benefit he has received. In other words, it is money and not judgment which directs the ballot; and so the election turns not on considerations of fitness or public good, but of private gain. Let such be tolerated, and elections will be simply the measure of the size of the candidates' purses. In the closing and degenerate days of Rome's august empire, preceding its immediate downfall, the imperial purple was sold at public auction to the highest bidder. Equally base and equally significant of present decay and impending down-fall would be the toleration of the private purchase of electoral votes. That which is wrong when done directly, is equally wrong when done indirectly. Salaries are paid by taxation, and when a candidate offers to take less than the stated salary, he offers to reduce *pro tanto* the amount of taxes which each individual must pay. If the candidate went to each elector and offered to pay one dollar of his taxes, that clearly would be direct bribery; and when he offers to take such a salary as will reduce the tax upon each tax-payer one dollar, he is indirectly making the same offer of pecuniary gain to the voter; so that those cases rest upon the simple proposition that the election of a candidate for office can not be secured by personal bribery offered directly or indirectly to the voter. . . . A further question may arise when the offer of the candidate carries with it no pecuniary benefit to the voter. As, for instance, should a candidate for a county office offer to give if elected a portion of his salary for the erection of a public fountain; or, if a candidate for a state office should offer if elected to endow a chair in some college; here it may be said that the voter is in no way influenced by considerations of personal gain. He receives no money in hand, his taxes will not be reduced, and he may in no manner be pecuniarily benefited by the donation. This presents a case going still beyond those which have been decided, and yet very probably the same decision should control such a case, and for this reason: wrong considerations are thrown into the scale to influence the vote of the elector. The theory of popular government is that the most worthy should hold the offices. Personal fitness—and in that is included moral character, intellectual ability, social standing, habits of life, and political

convictions—is the single test which the law will recognize. That which throws other considerations into the scale, and to that extent tends to weaken the power of personal fitness, should not be tolerated. It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot. It is in spirit at least, bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voter." (pp. 399-401.)

Applying the principles enunciated in the foregoing discussion to the facts of the present case, the votes of Branine, Wright, and Betts, sr. (finding No. 6) were void. If the consideration had been money, and the subject lay within the field of lawful contract, each of those voters could recover from the defendant in an action on an express "engagement," "contract," or "agreement." Beyond this, however, the court will not palter with forms of expression devised to avoid disqualification to hold office or penal consequence, but which attain unlawful ends. Conceding that no engagement, in the strict contract sense of the term, was entered into, because the defendant employed oblique phrases, he did in fact corrupt the minds of those voters to the same extent and by appealing to the same motives as if he had outspokenly and unreservedly bound himself. The method which he chose is merely a refinement on the old, coarse form of plain promise, and accomplished bribery in the sense in which the term is used in proceedings of this character.

The votes of the persons named in the fifth, seventh, and eighth findings can not be counted for the defendant. The law would be very impotent if it failed to follow corruption as far as it contaminates, and to deprive the instigator of every benefit accruing to him because of it.

The votes of C. C. Patterson (finding No. 8) and Elmer Wright (finding No. 9) were not challenged in the original petition. The evidence relating to those votes was taken by the commissioner in connection with the other evidence. Afterwards the court permitted the petition to be amended to include charges that those votes, and some others not referred to in the original petition, were void and should not be counted for the defendant. The order permitting the amendment reserved for future determination its effect on the evidence already taken. The defendant objects to consideration of the

charges contained in the amendment and seems to regard the
amendment as not yet sanctioned.  The amendment was speci-
fically allowed.  The reservation applied merely to such legal
questions arising on the evidence as were properly determin-
able only at the final hearing, and was made in order that
allowance of the amendment should not be taken as an in-
dication of how such questions might be decided.  The issue
respecting Wright's vote was fully tried, and the issue re-
specting Patterson's vote appears to have been fully tried.
The amendment was allowed on August 3, 1916.  The commis-
sioner's findings were not filed until November 2.  No applica-
tion was made to him or to this court for permission to take
additional evidence, and no showing of prejudice resulting
from the amendment has been tendered.  Therefore the ob-
jection to consideration of the amendment is overruled.

The court finds for the plaintiff.  The judgment is that he
is the duly elected mayor of Arkansas City and is entitled to
exercise the rights and privileges and to enjoy the emoluments
of such office; that the defendant be ousted from the office and
the plaintiff be placed in possession thereof; that the plain-
tiff recover from the defendant the salary of the office appro-
priated by the defendant while acting as mayor, in the sum
of ——— dollars; and that the plaintiff recover his costs.