No. 32,159

THE CITY OF IOLA, *Plaintiff*, v. H. HOBART, as Mayor of the City of Iola, *Defendant*.

(42 P. 2d 977)

Opinion filed April 6, 1935.

*Burney Miller, G. R. Gard* and *Stanley E. Toland,* all of Iola, for the plaintiff.

*Frederick G. Apt* and *A. R. Enfield,* both of Iola, for the defendant.

The opinion of the court was delivered by

DAWSON, J.: The city of Iola invokes our original jurisdiction in mandamus to require H. Hobart, mayor of the city, to sign a contract for the construction of a swimming pool.

Involved in the action are questions of law touching the validity of certain procedural steps taken by the city to acquire lands for the purpose of enlarging and improving its public park system, the significance to be attached to an authorized bond issue of $30,000, and negotiations with the federal government for a grant of funds toward the cost of the project.

The pertinent issues of law and fact were tendered in the city's application for the writ. Exhibits attached thereto included a copy of the ordinance under which the swimming-pool project was initiated, the notice of the bond election, and other papers and documents not necessary to be mentioned here.

The answer and return to the writ contained a narrative of the negotiations with the federal government, the conditional assurance the city had received that a federal grant of funds would be forthcoming, the acquisition of additional lands for park purposes, the terms of the $30,000 bond issue, and more potent than any of the foregoing—the allegation that the contract sought to be validated by the mayor's signature is for a sum of money which with the other pertinent expenditures already made and yet necessary to be made will greatly exceed the authorized amount to carry the park improvement and swimming-pool project to completion.

Although it might appear that the litigants could readily have simplified the issues to two or three controlling questions of law, their contentiousness required this court to appoint a commissioner to hear the evidence and report his findings of fact and conclusions of law thereon. Hon. C. O. Pingry, of Pittsburg, served in that capacity, and his comprehensive report is now before us. His findings of fact and conclusions of law sustain the attitude taken by the defendant mayor, and he recommends that the writ of mandamus be denied.

Exceptions to the commissioner's report have been filed by plaintiff—to an understanding of which it will require some matters of controlling significance to be stated with some detail:

The title and avowed purpose of the bond ordinance read:

"An ordinance declaring the expediency of improving the public parks of the city of Iola, Kansas, by the purchase of additional land, if necessary, and by the construction and building thereon a swimming pool, with buildings and appurtenances thereto; and providing for the calling and holding of an election in said city to procure authority for the issuance of bonds under the provisions of section 12-1302, 1931 Supplement to Revised Statutes of Kansas, 1923, and the amendments thereto, to raise the necessary funds to pay the costs and expenses of making said improvements.

"Whereas, the city of Iola is informed that the United States government, as a means of providing employment under the present economic emergency, will contribute thirty per cent of the cost of making the improvements hereinafter specified, and, whereas, said contributions will materially lessen the cost of the improvements hereinafter specified to the taxpayers of said city.

"SECTION I. It is hereby deemed and declared expedient and of public utility, that the public parks of the city of Iola, Kansas, be improved by the purchase of additional land, if necessary, and by the construction and erection thereon, on a location to be determined by the governing body of said city, a modern swimming pool, including buildings and appurtenances thereto.

"SECTION II. To raise the necessary funds to pay said construction and buildings of said improvements it is deemed and declared necessary to issue bonds of said city in the sum of $30,000, . . ."

## Some terms of the ordinance provided:

"SECTION VI. It is hereby provided that in event the city of Iola, Kansas, fails to obtain the grant of funds from the United States government to cover thirty per cent of the cost of the improvements provided for in section I of this ordinance, then, said bond issue shall be deemed null and void, which condition shall be stated in the notice of said election."

## The statute which sanctioned the bond election and the bond issue reads:

"That for the purpose of purchasing land for park purposes or for the erection of buildings thereon, or the improvement thereof, cities are hereby authorized to issue bonds or make a special levy for the special purpose whenever in the judgment of the governing body thereof it shall be expedient to purchase such lands or erect such buildings or make such improvements, but no such bonds shall be issued or special levy made until the governing body shall be instructed to do so by a majority of all the votes cast on the proposition at any general or special election. Such election shall be held and said bonds shall be issued as provided by law." (R. S. 1933 Supp. 12-1302.)

## The ordinance specified the proposition on which the electors of the city were invited to vote as follows:

"Shall the following be adopted: Proposition to issue bonds of the city of Iola, Kansas, to the amount of $30,000, for the purpose of providing funds to pay the costs of improving the public parks of said city by the purchase of additional land, if necessary, and by the construction thereon of a modern swimming pool, with buildings and appurtenances thereto, the issuance of said bonds to be contingent upon the United States government contributing thirty per cent of the costs of said improvements."

## The election results were these:

For the bonds .................................. 815 ayes
547 nays

On this result, the city hired an engineer for $1,000 to draw plans for the swimming pool. A tentative site for the swimming pool was selected in Riverside Park (thirty acres in extent) which had belonged to the city for many years. Underlying that site were important pipe lines of oil and gas companies, and one of these

offered $1,000 to the city to choose a site elsewhere. There is an old established agricultural society in Allen county which owned two tracts, 12.13 acres adjoining the city park on the northwest, and 45 acres adjoining the city park on the southeast. The society offered to convey both these tracts to the city upon condition that it would assume and pay the mortgage and other indebtedness pertaining thereto. This indebtedness was $12,160. The offer was accepted. The funds to liquidate the indebtedness on the lands thus acquired were procured as follows: The city owns its electric power plant. Pertaining thereto the city has two funds—the electric department fund, the electric department sinking fund. The first of these funds had a large but unstated amount of money to its credit. The second of these funds may be invested as authorized by statute (R. S. 1933 Supp. 12-830b) until needed to purchase or redeem the city's obligations pertaining to that department. The city decided to transfer $12,160 from the electric department fund to the electric department sinking fund; and then it borrowed that amount from the sinking fund to pay off the indebtedness against the two tracts of land it had acquired from the agricultural society. To keep straight the accounts of the sinking fund, the city executed to it ten demand notes for $1,000 each, and one for $1,160, all bearing six per cent interest, payable semiannually. Where the final $1,000 came from is not clear in the record. The interest on these notes is being paid out of rentals which the city collects from various persons and organizations for the privilege of using the acquired property. By resolution the city set aside seven acres of the acquired lands as the site for the swimming pool.

When the plans for the swimming pool were prepared, contractors were invited to submit bids. A majority of the city commissioners favored the bid of Lister and Cox, of Emporia, whose figures were as follows:

| "General | $31,535.00 |
|---|---|
| "Extra No. 1 | 280.00 |
| "Extra No. 2 | 750.00 |
| "Extra No. 3 | 500.00 |
| Total | $33,065.00" |

The federal government PWA gave its conditional approval of the project and promised to contribute $8,200 toward the cost of the labor and materials, but its contribution was not to exceed 30 per

cent of those particular costs. Lister & Cox were induced to revise their figures, and they reduced their bid to $31,535. This bid was accepted by a majority of the city commissioners, and it is the mayor's refusal to sign a contract based on such acceptance which has precipitated this lawsuit.

The record contains many other interesting facts, but space forbids any further narrative thereof except to show the total contemplated cost of this project:

"Land acquired ............................... $12,160.00
"Contract of Lister & Cox ...................... 31,535.00
"Expenses of bond election; paid on account to
    special· engineer· for services; and miscella-
    neous items ............................... 1,186.00
"Balance due the special engineer .............. 400.00
"Cost of connecting swimming pool with water
    main ..................................... 1,000.00
                                               _____
"Total ascertained cost ................... $46,281.00"

The assured contribution from the federal government may amount to $8,200 if the cost of labor and materials should reach that sum, but in no event will it exceed thirty per cent of the total cost of such labor and materials. The correspondence between the federal officials and the city emphasized the importance of this detail; and it will be noted that the bond proposition submitted to the voters contemplated a contribution from the government of thirty per cent of the cost of "said improvement," which would include considerably more than the mere cost of labor and materials.

However, an infirmity in this project of much greater importance than the matter just mentioned stands out of this controversy so that it overshadows all other details. The electors of Iola were invited to vote on a project which was not to cost more than $30,000, of which amount the federal government was expected to pay thirty per cent and failing in that expectation the whole project should be called off. What sort of a dish is now served up for this court to approve? The city has misused the funds of its electric department. The shifting of surplus funds of the electric department to its sinking fund for the ostensible purpose of having them available for investment was a transparent hocus-pocus which deceived nobody. The investment of these moneys in the agricultural society's lands was the sheerest camouflage to conceal a substantial part of the cost of the park and swimming-pool project on which the will of the voters was taken in the bond election.

Our commissioner did not deem it necessary to denounce this disingenuous feat of fiscal legerdemain, but it is impossible for this court to overlook it. We hold that the lands of the agricultural society were acquired pursuant to the avowed purposes of the bond ordinance and the bond election; and the cost of these lands, or the cost of liquidating the indebtedness on these lands, which was the consideration for their conveyance to the city, is as much a legitimate and proper charge involved in the total cost of the improvement project as any other item in the bill.

Touching the legal questions pressed on our attention, we are first reminded that the performance of a duty imposed on a public official by virtue of his office, trust or station, may be enforced by mandamus. (R. S. 60-1701.) Quite true, but there are important qualifications on that rule of law. In *State, ex rel., v. Younkin*, 108 Kan. 634, 196 Pac. 620, where mandamus was invoked to compel a county clerk to register a bond issue tainted with illegality, it was held that although the exclusive responsibility for the bond issue rested on the board of county commissioners, and the defendant's duty was purely clerical, he would not be required by mandamus to perform an act which in itself was purely incidental and ministerial to that which other officials were unlawfully seeking to accomplish.

In *Kolster v. Gas Co.*, 106 Kan. 84, 196 Pac. 738, it was said:

"Mandamus is a discretionary writ, and before granting it the court may and should look to the larger, public interest which may be concerned—an interest which the private litigants are apt to overlook when striving for their private ends. (Citations.)" (p. 86.)

See, also, *State, ex rel., v. Miami County Comm'rs*, 133 Kan. 325, 299 Pac. 965.

Among the exceptions taken by plaintiff to the findings of the commissioner is the thirteenth. His findings are only advisory. In the thirteenth finding he dealt more tolerantly with the maneuvers of the city to acquire the lands of the Allen County Agricultural Society than this court can approve. (*Hunt v. Gibson*, 99 Kan. 371, 375, 161 Pac. 666; *State, ex rel., v. Foley*, 107 Kan. 608, 193 Pac. 361.) The only statutory grant of power to the city to purchase these lands was for park purposes. (R. S. 12-1301; R. S. 1933 Supp. 12-1302.) Either the city bought this property as a part of the park improvement project, which included the swimming pool, or there has been such a flagrant diversion of the public funds of the city as would call for the investigation of a grand jury, not a mere

dispassionate examination of the corporate powers vested by statute in a city of the second class.

Moreover, before lands could have been lawfully purchased for the electric light plant the commissioner of finance and revenue, upon an advisory estimate by the head of that department, would have had to make provision for its purchase in the annual budget; and no expenditure in excess of the estimate could have been incurred. (R. S. 14-1601, 14-1602.) It is superfluous to say that no attempt was made to conform to these statutory provisions in the acquisition of these lands.

Plaintiff excepts to the finding of the commissioner that the cost of laying the necessary pipe line to connect the proposed swimming pool with the city water mains, estimated at $1,000, should be charged to the project. This finding must be sustained. The city has no other existing fund from which it could lawfully be met.

Objections are also made to the commissioner's nineteenth finding in which he holds in substance that even if the price of the land be eliminated from the total cost of the improvement, the remainder would exceed the amount the city has been authorized to spend on this project. If the entire cost of the land, $12,160, be omitted from the computation we have made above, and if the promised $1,000 donation from the oil company be also taken into account, the remainder would still be $33,121. But, it is argued, the sums already paid to the special engineer, the cost of the bond election and other incidental expenses, have already been paid out of the general funds of the city. They have been paid out of the pockets of the taxpayers who gave their sanction to an expenditure of the proceeds of a bond issue of $30,000 less what the government was expected to contribute. The electors of the city never did sanction an expenditure of any more, no matter what fund it has temporarily come out of. The election expenses, the services of the special engineer, and any other incidental expenses of this park-improvement project are as much a part of its total cost as are the wages of the men who dig the swimming pool and the price of the materials which go into its construction. Indeed, the city clerk testified that in practice such incidental expenses of projected improvements are met for the time being by drafts on the general fund, and that it is reimbursed when the moneys for the improvement are available. Of course, where a bond issue is defeated at an election, there are certain

incidental expenses which must be met by the general fund. (*State, ex rel., v. Bentley*, 98 Kan. 442, 157 Pac. 1197.)

Passing for the moment the important matter that the purchase price of the 57.13 acres of land should be considered as a part of the cost of the projected improvement, the city set off seven acres of that acquisition as the particular site of the pool, and allocated to the project the sum of $875, which would be $125 per acre. The cost of the entire tract was $212.85 per acre, and there was neither rhyme nor reason for estimating the value of the seven acres at $125 per acre—which is only another proof of the evasive financiering which the city has pursued from first to last in this project— the net result of which is the complete undoing of what was apparently a public-spirited project sanctioned by the voters of Iola and encouraged by the generosity of the national government.

This court has not overlooked the fact that the government has been approached for a larger allotment of federal funds, with a reasonable prospect that they will be granted, but even so, that grant in no event will exceed thirty per cent of the cost of labor and materials. The remainder of all costs must come out of the proceeds of the bond issue. Neither the bond ordinance nor the proposition submitted to popular vote is susceptible of an interpretation that the cost of the project was to be $30,000 plus whatever sum the government would contribute thereto. The language of the bond ordinance, and particularly sections 1 and 6 thereof, is explicitly to the contrary. The correct interpretation of the ordinance as well as the proposition on the bond election ballot is that the Iola taxpayers may be out of pocket $30,000 less whatever sum the federal government will contribute—and not a cent more.

It is not uncommon when a course of official action has been found to be illegal that any number of reasons can be advanced to show its illegality. The new cash-basis law (R. S. 1933 Supp. 10-1101 et seq.) was in full force and effect ere this park and swimming-pool project was set on foot. Not the slightest attention was paid to the terms of that law, which makes it perfectly clear, if it is not already apparent, that the city's authority for the incurring of debts and expenditures for this improvement was to be found within the terms of the statute which authorized the enactment of the bond ordinance, the ordinance itself, and the affirmative vote on the proposed bond issue—and under no other statute or rule of law whatsoever.

The record is long and suggests other matters which might be discussed, but time and space forbid. The controlling features of the commissioner's careful and helpful report are approved.

The writ of mandamus is denied, and judgment will be entered in favor of defendant.

Writ denied.