No. 26,700.

THE STATE OF KANSAS, ex rel. CHARLES B. GRIFFITH, Attorney-general, *Plaintiff,* v. A. H. CARL, County Attorney of Crawford County, *Defendant.*

SYLLABUS BY THE COURT.

COUNTY ATTORNEYS—*Removal—Official Misconduct.* In an original proceeding in quo warranto under R. S. 60-1609 *et seq.,* to remove a county attorney for official misconduct and neglect of duty; the record examined and the evidence held sufficient to require an entry of judgment in favor of the state as prayed for.

Original proceeding in quo warranto. Opinion filed April 10, 1926. Judgment for the plaintiff.

*Charles B. Griffith,* attorney-general, *William A. Smith,* assistant attorney-general, and *Tom Karr,* of Girard, for the plaintiff.

*John A. Hall,* of Pleasanton, *E. L. Rayborn,* of Girard, and *James A. Troutman,* of Topeka, for the defendant.

The opinion of the court was delivered by

DAWSON, J.: The state on the relation of its attorney-general brought this original proceeding in quo warranto to oust the county attorney of Crawford county from office on charges of official misconduct and neglect of duty.

Counties, 15 C. J. p. 496 n. 98. District and Prosecuting Attorneys, 18 C. J. pp. 1302 n. 36, 1315 n. 54. Officers, 29 Cyc. p. 1407 n. 11. Quo Warranto, 32 Cyc. p. 1461 n. 94.

The action was filed on September 10, 1925, following an investigation of the defendant's administration of his office pursuant to R. S. 60-1610, 60-1619, 60-1622; and on application of the attorney-general the defendant was suspended from office; and W. L. Cunningham, Esquire, of Arkansas City, was appointed commissioner and authorized to summon witnesses, administer oaths, and to take, hear and record the testimony and other evidence, and to report his findings of fact and conclusions of law to the court.

Plaintiff's petition comprises eighteen printed pages of the abstract. The testimony taken before the commission covers 685 pages. The affidavits taken in the attorney-general's preliminary investigation comprise several hundred pages. The exhibits consisting of records and files from the courts of justices of the peace of Crawford county, jail records, miscellaneous receipts, checks, documents and data, fill a goodly sized dry-goods box. The evidence has been abstracted and reduced to 148 closely printed pages, and the commissioner's report covers 36 pages.

It would be impracticable to reproduce the pleadings, the abstracted summary of the evidence, or the commissioner's report, except so far as occasion may require in our discussion of particular matters noted below.

The state's case against defendant may be thus summarized:

At the general election in November, 1924, the defendant, A. H. Carl, was elected to the office of county attorney of Crawford county, and was inducted into office on January 12, 1925. The county seat is the city of Girard, in the north central part of the county, where Carl had his office. The district court has two judges, who held court at Girard and at Pittsburg, the latter city being the county metropolis and located in the southeastern part.

Coal mining is an important industry in the county and gives employment to a large number of foreigners, many of whom have little familiarity with our language, governmental institutions and laws, and many of whom are particularly prone to violate the prohibitory law, particularly that phase of it which forbids having possession of intoxicating liquor.

There is a small town named Mulberry near the Kansas-Missouri state line, some fifteen miles northeast of Girard, where two barbers, Charles Fowler and J. B. Vallenbois, held the offices of justices of the peace.

In the city of Pittsburg, one John H. Vivian held the office of

State, *ex rel.*, v. Carl.

justice of the peace, but he was practically without jurisdiction because of the establishment of a city court. ( R. S. 20-1401 *et seq.*) One T. R. Jones was justice of the peace in Girard.  Fred Black was the constable of Lincoln township, near the city of Mulberry. Rudolph Mori and Arthur Schirard were deputy constables appointed by Black, and these three police officers figured prominently in most of Carl's activities as a prosecutor of violators of the prohibitory law.  One John Turkington was sheriff of the county, and had a staff of deputies stationed at Girard and Pittsburg.  Carl seldom used the services of the sheriff, for the claimed reason that he could not get effective service from him or his deputies.  We need not cumber our opinion with further mention of officials at this point.

Soon after taking office, the defendant instituted a system of prosecuting violators of the prohibitory law by filing complaints before some one of the above-named justices of the peace.  He signed complaints in blank and left them with the justices for use as occasion required, and sometimes he authorized one of these justices of the peace by telephone to sign his name to such complaints, and warrants were issued thereon which were delivered to the constables, commonly to Black, Mori and Schirard, for service.  By authority of these warrants, the constables raided the premises of the accused persons, seized whatever liquors they found and brought the accused persons before the justice.  Frequently many of these persons pleaded guilty and were fined and sentenced to jail in substantial accord with the statute, but in a large number of instances they were adjudged to pay a fine and costs, but without a jail sentence; or if a jail sentence was imposed, the convicted person would be given some days' time before he was locked up, and in some instances the commitments were delivered to the guilty persons themselves, leaving it to their own good time and pleasure when, if ever, they would present themselves at the county jail to be locked up, and not infrequently they were not sentenced or sent to jail at all.

Another practice which grew to large proportions was the exaction of costs from accused persons who were never brought to trial, which costs usually were grossly excessive, and included a charge of twenty-five dollars for the county attorney, such as is allowed to that officer by statute where he properly secures a plea of guilty or a conviction under the penal provisions of the prohibitory liquor law. When the costs thus exacted were paid, the accused persons were

permitted to depart, and their cases indefinitely postponed. Sometimes parties who pleaded guilty and were subjected to a fine, costs and jail sentence, would appeal to the district court, but later would return before the justice of the peace and pay part or all of the costs and fine, but no final disposition of the appeal would be taken notwithstanding such acquiescence in the judgment of the justice of the peace. This method of handling liquor prosecutions continued under defendant's administration of the office of county attorney until about the middle of August, 1925, when the attorney-general was called to the county to prosecute the constables, Black, Mori and Schirard for accepting a bribe of $100 from some persons whom they had arrested for violating the prohibitory law. The county attorney sat in the court room during the preliminary examination of the bribe-taking constables and promptly caused the arrest of the state's witnesses, to the obvious embarrassment of the attorney-general, who then turned to a rigid investigation of the county attorney's general official conduct, under the ouster law of 1911. (R. S. 60-1609 *et seq.*) At an inquisition held before the attorney-general on August 19, 1925, Charles Fowler, justice of the peace for the city of Mulberry, deposed at length concerning the handling of a large number of cases instituted before him by the defendant Carl, thus:

"Q. Judge, your name is Charles Fowler and you are the justice of the peace in Mulberry, Washington township, Crawford county, Kansas? A. Yes, sir.

"Q. And this book here is your criminal docket? A. Yes, sir.

"Q. Now, referring to the case of the state of Kansas against Ida McGaughey, it appears that this woman is charged with having fifty-two quarts of home brew in her possession? A. Yes, sir.

"Q. The last entry on your docket here is 'Plaintiff [defendant] paid into court the costs, $48.05, and case is continued indefinitely,' is that right? A. Yes, sir. . . .

"Q. Was he [the county attorney] there when it was made? A. He was there when the case was called; he knew the case was continued; yes, sure.

"Q. Well, did he know that the costs were paid? A. Yes, sir. . . .

"Q. Now referring to case on page 125, the case of the state of Kansas against John Benedict; that shows that he was charged with the possession of liquor, does it? A. Yes, sir.

"Q. And shows an entry on page 126, 'The said John Benedict appeared and deposited the costs in the above-named case and the court continued the case indefinitely on order by the county attorney.' Is that right? Does that show the correct disposition of the case? A. Yes, sir.

"Q. Now up at the top, the title of the case, the head of the case here, shows costs, what is that, $47.25? A. There is a difference in them all. . .

State, *ex rel.*, v. Carl.

"Q. Well, he [the county attorney] knew about the costs being paid, did he? A. Well, yes; sure. . . .

"Q. Now this case on page 135, the state of Kansas against Frances Zetko; she was arrested for having some wine? A. Wine and cider.

"Q. The entry here is 'Case continued indefinitely.' Did she pay her costs? A. She paid her costs, too.

"Q. And included in that was twenty-five dollars for Mr. Carl? A. Yes, sir.

"Q. It was? A. Yes, sir.

"Q. Did you pay it to him? A. Yes, sir. . . .

"Q. Now here is one at page 136, state of Kansas against Matt Zuidasich, that says, up here, 'Said Matt Zuidasich paid into court the costs of $46.25, by order of the county attorney, the court continuing the case until further orders.' Mr. Carl knew about that, no doubt? A. Let's see; where was he from?

"Q. A gallon of 'mule' and thirty-one quarts of wine? A. Yes; that was at Gross.

"Q. Gross? A. Yes; you see they crawled in under the house and found this stuff under there, and it was wrapped in old rags, and the rags were rotten. Of course they arrested this man and brought him in, and he gave a bond, and when it came the day of the trial, it looked a little obsolete, that stuff was there and there wasn't any way of. getting up through the floor and he offered to deposit the costs, and we continued the case.

"Q. Did Mr. Carl know about that? A. He was right there.

"Q. You pay him his $25? A. On this case?

"Q. Yes. A. Yes, sir. . . .

"Q. Now here on page 156, is a case of the state of Kansas against Karl Cocik? A. Yes, Cocik; I guess that is what it is.

"Q. He was charged with having a half a pint of whisky and one hundred quart bottles? A. Empty.

"Q. Yes; and ten one-gallon jugs. The entry there shows 'The defendant in the above case, Karl Cocik—' A. Deposited costs, $51.05.

"Q. 'And the case continued.' Did Mr. Carl know what disposition was made of that case? A. Yes, sir.

"Q. He did? A. Yes, sir.

"Q. And he received his $25 on that? A. Yes, sir.

"Q. Was Mr. Carl there when that arrangement was made about that case? A. He was."

The justice was catechized about many similar cases, all to the same general effect, and the attorney-general's inquisition then turned to the matter of the county attorney signing many complaints in blank, as a basis for warrants to be issued to Black, Mori and Schirard, the constables.

"Q. Now these cases where you state he signed them in blank, you used warrants on them, did you? A. Yes.

"Q. And the warrants were served? A. Yes, sir.

"Q. You issued warrants? A. Yes.

"Q. And you assisted in those cases? A. Yes.

"Q. And the defendants were arrested?   A. Yes, sir.

"Q. Of course that was Mr. Carl's advice to you, was it, to issue those warrants when these constables came in?   A.  Sure; I wouldn't have issued them if it hadn't have been; that is, I issued them when the constables came in for them. . . .

"Q. Well, Mr. Carl told you, did he, that it would be all right for him to sign up a bunch of complaints in blank and leave them with you and you could fill them out?   A. Well, they were left with me and he gave them to me that way.

"Q. Did he tell you to issue the warrants on them?   A. Yes, sir.

"Q. And you wouldn't issue them unless he did, would you?   A. No, sir.

"Q. And who would furnish the information that was put in the warrants, the constable?   A. The constable.

"Q. And you would put it in?   A. And issue a warrant and away they would go."

Recurring to the matter of the defendant's collection of fees in cases where no judgments were entered, the same witness deposed:

"Q. Do you remember any other case where people would come in and pay the costs other than the ones we have talked about?   A. No.

"Q. Mr. Carl knew about the disposition of these that we have talked about, did he?   A. Yes; he should have known.

"Q. He was right there?   A. Yes, sir.

"Q. Well, what I mean, you didn't take a person's costs and just continue the case without the county attorney knowing, did you?   A. No, sir; I couldn't do that; I couldn't continue the case. . . .

"Q. Mr. Carl always handled these cases for you, did he?   A. Yes; he handled all of them, I suppose, all over the county. . . .

"Q. Did you always pay Mr. Carl in cash, or did you sometimes give him a check?   A. I think I always paid him in cash."

Within three days after giving this testimony before the attorney-general, the defendant Carl got hold of Fowler and obtained from him an affidavit in which he did his best to break the force of the damaging testimony he had given against him before the attorney-general.  Among its averments are these:

"4th.  I will further say that during my term of office as justice of the peace of Mulberry, Crawford county, Kansas, and during the term of A. H. Carl as county attorney of Crawford county, Kansas, that I have never paid him any fees whatsoever in any liquor cases, or any other cases, unless the case had been adjudicated; that if I have made any statements prior to this date in which I said A. H. Carl, county attorney, had knowledge of and knew about said fees or costs having been deposited and paid to him, I made a misstatement, as I have in my possession all costs that have been deposited with me by persons violating the prohibitory liquor law of the state of Kansas, and I am now ready and willing to do whatever the proper officials tell me to do with said costs now deposited with me.

State, *ex rel.*, v. Carl.

"5th. I will further say that A. H. Carl, county attorney of Crawford county, Kansas, at no time asked or knew that any violators of the prohibitory law had deposited costs with me during the time he has been county attorney of Crawford county, Kansas.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"7th. I will further state that at no time did A. H. Carl, county attorney, advise me or instruct me to continue cases indefinitely in my court during the time he has been county attorney of Crawford county, Kansas.

"8th. I will further say that at no time has A. H. Carl, county attorney of Crawford county, Kansas, placed in my hands complaints signed in blank, whatsoever. . . ."

Many other witnesses were called by the attorney-general and gave testimony to the same general effect, but when they were placed upon the witness stand before Commissioner Cunningham, some of them, and particularly Fowler, were unwilling to give the same sort of testimony they had given at the attorney-general's inquisition and which was used in support of the state's motion to suspend the defendant on September 17. However, the justices' dockets, the files and the testimony of many of the persons who had been subjected to arrest and who had paid heavy sums as costs without conviction or plea of guilty and the requisite jail sentence and imprisonment attaching thereto, were examined by the commissioner, and the following is his partial summary of the facts:

"The evidence showed very conclusively that the prohibitory liquor law was not being enforced in an honorable, dignified and vigorous manner;

"There was evidence of scores of cases filed, arrests made, costs paid, or fines and costs paid, and the cases forgotten;

"The defendants plead guilty, or were convicted and the justice of the peace simply told the defendant to go to jail, or gave him a commitment, sometimes dated months ahead, and expected the defendant to commit himself to jail;

"Constables made raids on warrants issued by the county attorney, took only part of the intoxicating liquor found, and left enough for another raid the next day; . . .

"Defendants were convicted, sentenced, served their time—sometimes as persistent violators, in the state penitentiary—and were again arrested for violating the prohibitory liquor law on a simple misdemeanor charge;

"The county attorney tells the justices of the peace that it is all right to collect and distribute costs before due, in plain violation of the statute, because the constables needed their costs. He then advised that the costs would have to be refunded if the defendant was not convicted;

"Old women were arrested, and on their refusal to pay costs were threatened with commitment to the 'chicken farm' [the State Industrial Farm for Women, R. S. 76-2501], which for some undisclosed reason always induced them to 'dig' up the money;

"The attorney-general of the state arrests the county attorney's star raiders, and then the county attorney arrests the attorney-general's star witnesses;

"Costs and attorney's fees are collected in injunction cases which were never filed."

Following this summary, the commissioner analyzes with laborious detail some forty-eight criminal cases in which defendant was concerned, some of which tend to show official misconduct on the part of defendant in knowingly giving countenance to the exaction of costs (including fees in his own behalf) from accused persons without trial and conviction, and tend to show willful neglect of duty to follow up to a proper conclusion liquor cases which had been instituted before justices either upon defendant's initiative or brought to his attention after arrests had been made. The evidence deducible from some of these cases tends to show that defendant gave countenance to the practice of the justices permitting persons to go at large after pleading guilty. The evidence deducible from some of these cases tends to show that persons who were persistent violators and who had previously served jail sentences, and one or two who had actually served penitentiary sentences, for persistently violating the prohibitory law were permitted by defendant to plead guilty to misdemeanor charges. A considerable number of these forty-eight cases are of little evidential significance except on the question of defendant's sincerity and good faith as a prosecuting officer. On that point we shall comment later.

The commissioner's findings of fact conclude thus:

"I therefore find:  .

"(*a*) That the defendant Carl has willfully misconducted himself in office as charged in the petition in that he has failed, neglected and refused to diligently prosecute to conviction and punishment the defendants charged with violating the prohibitory liquor law, and especially those who have practically admitted their guilt by the payment of costs, and in some cases fine and costs.

"(*b*) That the defendant Carl has willfully neglected to perform the duties enjoined upon him as county attorney by the laws of the state of Kansas, as charged in the petition, in that he has willfully and knowingly refused to prosecute violators of the prohibitory liquor law under the persistent violator statute. That he knew, or by the exercise of ordinary care should have known, that they should have been prosecuted under the persistent violator statute.

"(*c*) That the defendant Carl entered into a conspiracy with the justices of the peace, constables and deputy constables named in the petition by which they carried out the common purpose and design of arresting defendants for the sole purpose of collecting from them costs.

"CONCLUSIONS OF LAW.

"I therefore conclude as a matter of law that the writ of ouster as prayed for in the petition should be granted, and that the defendant Carl should be ousted from the office of county attorney of Crawford county, Kansas."

The attorney-general moves for judgment on the commissioner's report. Defendant moves to set aside the commissioner's findings and conclusions and for an order reinstating him in office. In support of defendant's motion, eminent counsel have filed a vigorous and exhaustive brief, in which sharp issue is taken on most of the commissioner's findings, and the astonishing argument is made that in instituting this action the attorney-general has aligned himself with the lawless element of Crawford county's population, and much emphasis is placed upon the evidence of certain witnesses—ministers, lawyers, doctors, bankers, teachers and laborers—who testified or offered to testify before the commissioner that defendant's reputation as a citizen and law-enforcement officer was good. On this point the commissioner's report reads:

"In making my findings I have done so on the theory that Mr. Carl, the defendant, was able to prove, and did prove, that his reputation as a law enforcer was very good, and that he was the best law-enforcement officer that Crawford county ever had; but it is the position of your commissioner that if he was guilty of willful misconduct in office and of willful neglect to perform his duty, it is immaterial what his reputation was."

And this finding leads logically to one phase of this case which invokes the most earnest solicitude of this court—the question of defendant's good faith in what he did and did not do concerning the plethora of liquor and other cases with which he was officially concerned as disclosed by the record. (*State v. Trinkle,* 70 Kan. 396, 401, 402, 78 Pac. 854; *State, ex rel., v. Foley,* 107 Kan. 608, 193 Pac. 361; *State, ex rel., v. Wilson,* 108 Kan. 641, 650, 651, 196 Pac. 758.)

This court fully appreciates the onerous burden of responsibilities which rests on the shoulders of a county attorney, especially in a county like Crawford with its dense population and varied activities and its large element of unassimilated foreigners, and the many problems of local government with which a county attorney has to deal. Of necessity much is left to his discretion touching cases which must be prosecuted, and what cases may be dismissed for want of evidence, and whether any may be properly dismissed on stipulation with the trial court's approval and on payment by

the defendant of such court costs as would otherwise have to be paid out of the county treasury. The court realizes how important it is that a high-minded and courageous prosecuting officer, engrossed as he must constantly be in warfare against law-breakers, should not have his attention distracted from his duties by having to maintain a rear-guard defense in his own behalf against bushwhackers and fault-finders disposed to inveigh against his activities, to misconstrue his motives, and belittle his accomplishments.

But what have we here to throw light on the question of defendant's good faith? When A. H. Carl was county attorney-elect, a few days before he was inducted into office, he accepted employment from one Carl Zaputa who was charged with a violation of the prohibitory law. Zaputa paid him twenty-five dollars. Defendant must have known he could not perform a lawyer's duty to a proper conclusion in that case. And he did not. The case was continued until after defendant Carl became county attorney, when one Rayborn, a lawyer to whom Carl turned over some of his private practice, was employed by Zaputa, and the case was permitted to drift until this ouster suit was begun, after which it took on life, and the justice's docket of T. R. Jones was then written up to show repeated continuances—to January 18, January 30, February 19, and March 20. The connection of further continuance is then broken, but the record dated September 15 recites Zaputa present, and "A. H. Carl, county attorney, present for the state," arraignment, plea of guilty on one count, "thereupon all other counts in the complaint was on motion of the county attorney dismissed." Then follow imposition of fine and jail sentence, and "costs taxed at $57.80," which included the $25 fee awarded to the county attorney by the statute. So here we have a case where the defendant accepted a fee to defend a criminal knowing he could not with honor give him professional service, and eventually appearing for the state and against the criminal, and exercising his official discretion as to what counts of the offenses charged against that criminal should be dismissed. And in the final disposition of the case, a fee of $25 was taxed in his favor as attorney for the state—a plain case of a fee from each side. But it is argued that in the long list of cases where attorney's fees were taxed as part of the costs and paid by persons who were arrested but not prosecuted, the defendant did not accept the fees charged and collected in his behalf. The deposition given by Justice Fowler in the attorney-general's inquisi-

tion was frankly and convincingly to the contrary. And the court can attach little credence to Fowler's later affidavit and testimony which manifestly show a labored effort to shield defendant and to minimize, qualify and abjure his testimony given at the attorney-general's investigation.

Another illuminating circumstance touching the exaction of fees in the county attorney's behalf in liquor cases not brought to trial, was such a fee collected in the case of *State v. Ben Watson,* who was arrested on a warrant issued by J. B. Vallenbois, another justice of the peace for the city of Mulberry. The warrant, dated June 29, 1925, bears the indorsement, "Continued indefinitely, costs paid." These costs were about fifty dollars and included an item of twenty-five dollars for the county attorney, which was paid to defendant. After the attorney-general held his inquisition into the official conduct of defendant on and about August 19, but before this ouster action was filed the defendant energetically began to set his official house in order; and on August 21 (or later) he instructed Fowler, justice of the peace, to set for trial on September 3, all the cases of persons who had paid costs and whose cases had been indefinitely continued or otherwise allowed to drift, and among other matters done in anticipation of the expected ouster suit, on September 5, defendant sent his check for twenty-five dollars to Justice Vallenbois for the return of his unearned fee in the indefinitely continued Watson case. It is argued that the acceptance of this fee was a mere inadvertence, and not justly subject to a prejudicial interpretation against defendant. But in his answer to the attorney-general's petition herein, defendant admits that as early as August 17, the day the preliminary investigation of the bribe-taking constables was held, defendant anticipated the ouster suit, giving its forecast as an excuse for his arrest of the witnesses who testified against the bribe-taking constables. The answer, in part, reads:

"Defendant says: That he had been told on numerous occasions that the politicians were going to bring ouster proceedings against this defendant, and that he didn't want to be charged with having failed, neglected and refused to prosecute the said Herman Youvan, Joe Sais and John McNamara, and that this defendant had no intention whatever of intimidating the prosecution instituted against Fred Black, Rudolph Mori and Arthur Schirard by the assistant attorney-general, William A. Smith."

Nor on the question of defendant's official good faith is it possible to minimize the significance of his conduct in this matter of arresting the state's witnesses in the bribery case. It cannot be seriously

supposed that defendant thoughtlessly considered it a relatively unimportant matter that the constables he had seen fit to trust in making liquor arrests should be guilty of taking bribes from the ignorant foreign bootleggers upon whose testimony the state was largely dependent for conviction of the bribe takers. That burst of simulated zeal in causing the summary arrest of the state's witnesses, to our minds savors not of good faith, but potently and damagingly of bad faith. It tended to show that not only were the defendant and these constables and these justices engaged in a common scheme and conspiracy to extort money from the law-breakers under the guise of costs in counterfeit prosecutions, but that the county attorney was prepared to pervert the criminal machinery of the state to intimidate persons who would dare to inform on his myrmidons. The hackneyed argument is made that the state's witnesses against defendant are largely of the lawless criminal classes who would naturally be hostile to an honest and courageous prosecuting attorney. That is true. We have been careful not to overlook that possibility and its implications. But it is also true that in cases of laxity of official zeal, of willful mis-conduct and neglect of duty, particular instances of official delin-quency frequently have to be proved, if at all, by the sort of people who are mixed up therewith in some degree, for the excellent reason that the local college president or principal of the high school or foremost church divines and similar leading citizens of the community are quite unlikely to know anything about the subject. However, in this very case we have some testimony entitled to sub-stantial weight on the important question of defendant's good faith. The Rev. Wilber N. Mason, pastor of the Methodist church at Pittsburg testified:

"Q. I will ask you if you had a conversation with Mr. Carl with reference to his failure to file complaints against people who were persistent violators of the prohibitory laws, along last spring. A. With several other of the ministers of the city I went to Girard and saw Mr. Carl in his office, and we were talking about law enforcement, and among other things that were spoken of we urged Mr. Carl to bring charges for a second offense against those who had already offended and had been convicted of violating the prohibitory law.

"Q. For second offense you mean charges of a felony, that they be sent to the penitentiary? A. Yes, sir; that was the thought.

"Q. And what was Mr. Carl's answer to that? A. And we rather urged that as a necessity if the law were to be effective. Mr. Carl said, in substance,

that in his campaign he had said that he would not bring the charge of a second offense, excepting it had occurred in his administration.

"Q. That is, except the first offense had occurred in his administration? A. Except they had been previously convicted in his administration.

"*Cross-examination:*

"Q. But he did tell you, didn't he, Doctor, that he would be willing and that he expected to bring charges under the persistent violation act as to those whose first offense occurred during his term? A. Well, I don't know whether his conversation could be interpreted as amounting to that or not. He replied to us in such a way that he made me feel, at least, and I think the other men who were with me thought, he meant to tell us preachers where to head in on that matter. Now that was the impression he made upon me.

"Q. At any rate, there was some little ruffling of the atmosphere? A. I don't know there was any temper; I don't think that; don't misunderstand me; I don't think there was any evidence of temper or anger in the matter. He simply gave us to understand that he had made a promise in his campaign and that he was going to keep that, no difference what we said."

Space forbids that this subject be further pursued. A diligent perusal of this long record shows little evidence to indicate that the many irregularities in defendant's official conduct were unintentional or otherwise excusable; and the evidence which does illuminate that phase of our inquiry is decidedly to the contrary.

The law of the case is very simple. The statute (R. S. 60-1609 *et seq.*) authorizes the summary suspension and removal of unfaithful public officers by a civil action of ouster. It is civil, not criminal, in character (R. S. 60-1601 *et seq.; State v. Rose,* 74 Kan. 262, 266; 86 Pac. 296; *State v. Everhardy,* 75 Kan. 851, 90 Pac. 276). The affidavits secured by the attorney-general in his preliminary inquisition are competent evidence, subject to the pertinent provisions of the code (R. S. 60-2830, 60-2832, 60-2835; *Business Blocks Co. v. Gregory,* 102 Kan. 33, 169 Pac. 191), and the fact that the state's witnesses at the hearing before the commissioner sought to change, qualify or repudiate the testimony they had theretofore given does not necessarily destroy the evidential significance attaching to the seemingly disinterested testimony they had given in the first instance bearing on the matter in issue. (*State v. Taylor,* 119 Kan. 260, 237 Pac. 1053; *Di Carlo v. United States,* 6 Fed. [2d.] 364.)

Whatever zeal or success the defendant may have shown in prosecuting liquor cases before the district court or elsewhere, the

conclusion is unavoidable that he failed in his duty to prosecute to a, conclusion sincerely or diligently a large number of cases instituted by him before these justices of the peace (*State, ex rel., v. Baird,* 117 Kan. 549, 231 Pac. 1021) ; and the oft-repeated extortion from persons accused of crime of large sums of money by the justices and their disbursement to constables or to themselves or others—to all of which defendant gave sanction and countenance whether·he pocketed his share or not—constitutes willful misconduct in office. (*State v. Cooper,* 120 Tenn. 549; *State v. Maires,* 33 N. J. L. 142.) The pertinent penal statute forbidding such practices reads:

"Every officer who shall by color of his office unlawfully and willfully exact or demand and receive any fee or reward to execute or do his duty, or for any official act done or to be done, that is not due, or more than is due, or before it is due, shall upon conviction be adjudged guilty of a misdemeanor, punished by fine not exceeding five hundred dollars, or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment." (R. S. 21-810.)

Counsel for defendant refer to the practice where the prosecuting attorney, when doubtful of success in criminal cases because of paucity of evidence or other good cause, stipulates that such cases may be dismissed on payment of costs by the defendants concerned; but in many cases disclosed by this record there was neither dismissal nor stipulation to that effect, nor want of evidence to justify dismissal, and the sums extorted from the accused persons "as costs" bore very little relation to the costs authorized by statute which would be chargeable to the county if the prosecutions failed.

A technical point much stressed by defendant's counsel is that the principal charge against Carl was that of having entered into a conspiracy with the justices of the peace and constables to use the criminal law for the purpose of making money for themselves under the guise of court costs, and that such conspiracy was not proved. There was not and could scarcely be direct testimony on this matter, but the evidence inherent in the circumstances and in the acts and delinquencies of the parties support the commissioner's finding that such conspiracy did exist; but we also agree with the commissioner that a failure of proof of such conspiracy would not exculpate the defendant, since the evidence was overwhelming that the defendant's course of dealing with many cases disclosed by the record was so grossly irregular as to be designable by no other characterization than that of willful misconduct and

willful neglect of duty.  (*State, ex rel., v. Baird,* 117 Kan. 549, 231 Pac. 1021.  See, also, *Attorney-general v. Tufts,* 239 Mass. 458.)

The defendant's motion is denied, and the state's motion for judgment is sustained.

Judgment for plaintiff.