No. 32,200

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney General, and FRANK W. TAYLOR, County Attorney of Allen County, *Plaintiff*, v. J. D. BUCHANAN, Finance Commissioner of the City of Iola, in Allen County, *Defendant*.

(51 P. 2d 5)

Opinion filed November 9, 1935.

*Clarence V. Beck*, attorney general, *Everett E. Steerman*, of Emporia, *Frank W. Taylor*, of Iola, and *W. D. Kimble*, of Topeka, for the plaintiff.

*Kenneth H. Foust*, of Iola, for the defendant.

The opinion of the court was delivered by

SMITH, J.: This is an original action in quo warranto to oust the defendant from the office of city commissioner. The defend-

ant was suspended from office shortly after the action was begun. A commissioner was appointed to hear and determine the issues. This commissioner found the facts in favor of the defendant. Plaintiff has moved for judgment of ouster notwithstanding the report of the commissioner.

In actions where this court has appointed a commissioner to hear-evidence and determine issues of fact, it is the duty of the court to examine the whole record and reach its own conclusion as to the facts. (See *State, ex rel., v. Duncan*, 134 Kan. 85, 4 P. 2d 443.) In that respect this action differs from one that is tried in district court and appealed on a question of fact. With that rule in mind we have examined this record.

The first cause of action in the petition charges defendant with using his influence and vote in awarding a contract for the paving of a street in the city and with receiving $365 from the contractor in payment therefor. The contractor, one Fry, was a witness for the state. He testified he was a friend of defendant and helped him get into office; that shortly after his term started defendant asked him how he could make some extra money. He testified that after the petition for the paving in question was circulated there was a conference at his house at which it was agreed that the profit on the binder used in paving the street was to be split three ways, that is, between defendant, the witness Fry and one Ashford, the city engineer. He testified further that the contract was awarded to him; that his profit on the binder was about $1,100; that he drew a check for $726 and some odd cents from the bank payable to a man in Kansas City; that he cashed the check and paid defendant $365 and paid Ashford $360. On cross-examination he testified that he had not been promised any immunity for testifying and that he had fallen out with defendant about the award of another contract for paving which was not awarded to him.

Ashford was the next witness for the state. He was city engineer. It was his duty to prepare the plans and estimates for paving and to supervise the construction. He testified that he did not remember going to Fry's house before the contract was let, but after it was let Fry called him up; he went down to his house; and that defendant and his wife came there; witness, defendant and Fry all went upstairs to Fry's office. At this point the testimony of this witness becomes confused. He was asked to state the conversation that occurred there among the three. He answered that he did not

think he could do that. Counsel for the state then started to cross-examine him with reference to a statement he had signed. Over the objection of defendant this was permitted. He then claimed immunity and was advised if he claimed immunity and then was forced to testify he could not be prosecuted on account of anything about which he should testify. The net result was he testified that Fry agreed that if he would take the place of Fry's brother Dick while he was in the hospital Fry would pay him one third of the profit on the binder. Witness testified that Fry might have said that he would divide the profit three ways. Witness testified that Fry said he was going to give him a third and was going to give defendant a third, but he would not say that defendant was there when Fry said this. Witness testified that he swore to the following affidavit:

"Charles H. Ashford, being first duly sworn, upon his oath says: That I am a resident of Iola, Allen county, Kansas; that I am, at the present time, and have been during all of the times referred to in this affidavit, the duly appointed and qualified city engineer of the city of Iola, Kan.; that as a part of my duties as city engineer I prepare the plans and specifications in connection with the construction and reconstruction of the paving on the streets of said city; that in May, 1933, and prior to the letting of the contract to R. D. Fry, or the Iola Construction Company, which is one and the same, for the resurfacing of Chestnut street between the north line of Madison to the south line of Monroe, J. D. Buchanan, R. D. Fry and myself met down at the Iola Button Factory in the afternoon and agreed that we would meet down at R. D. Fry's house at 7:30 that evening to determine the amount of profit in the job and the amount that would be paid to J. D. Buchanan and myself as a pay-off for giving our assistance in obtaining the contract for the Iola Construction Company."

He testified that the affidavit was true except that the time of the meeting at Fry's house was after the contract was let instead of before. He testified that the job did not hold up very well because gravel rather than crushed rock was used in the binder. The gravel was cheaper. He further testified that he received $360 from Fry. On cross-examination he testified that he told the county attorney the date in the affidavit was wrong, but the county attorney did not change it. He testified that the only thing discussed while defendant was present was whether gravel or crushed rock would be used in the binder. Reluctantly and after being asked three or four times Ashford finally testified that he was not sure, but to the best of his recollection defendant was gone when Fry told him he was going to give him a third. On redirect examination he repeated that

he told the county attorney that the affidavit should have stated the meeting at Fry's house took place after the contract was let rather than before; and that what Fry was doing at the meeting was figuring the difference in the cost between gravel and crushed rock and that it was not unusual for a contractor to figure the cost of materials after the contract had been let. On recross-examination he testified that at the time of the county attorney's inquisition he was promised immunity and was told if he did not come clean it would be too bad, but no strong-arm methods were used. In response to questions by the commissioner he testified that he received the money from Fry for working for his brother; and defendant never told him anything about receiving money from Fry; that at the meeting in Fry's home Fry did not figure any costs; that he had prepared the estimates for the job; and that he had talked to defendant about it first. In redirect examination he testified that he told defendant what he had put in the statement to the attorney general and what defendant told him could not be repeated in the presence of ladies; and that defendant told him he was a fine fellow to be telling what was not true.

Jesse C. Benson testified that he was cashier of the bank; that July 7, 1933, the account of Fry showed a check drawn payable to Wm. R. Martin for $726.50; that he kept books for Fry and that at the time of writing the check Fry mentioned that he needed the money with which to pay for some equipment.

Mr. Hobart, the mayor of the city, testified that when the resurfacing of the street in question was first brought up it was turned down because some property owners on the street in question were in arrears in taxes; that after defendant became finance commissioner he stated that people were ringing his telephone off the wall asking about it, but that no one called him, and that defendant took office in April, 1933, and defendant and Bartlett voted to have the street resurfaced in May.

For the defense, Mr. Bartlett, the utility commissioner, testified that he voted to pave the street after defendant became finance commissioner; that the contract was let to Fry, who was the lowest bidder; and that the job did not hold up very well, since it broke along the edges.

The defendant testified he was well acquainted with Fry; that Fry advised him not to run for commissioner because he could not be elected; that when the paving contract in question came up he

and Bartlett voted for it and the mayor voted against it. He was present at a meeting at Fry's house after the contract had been let. He testified that he and his wife were walking to his button factory to do some work and that when he came to Fry's house he saw Ashford in there playing the piano; that he just "hollered" in and Fry came to the door and wanted them to come in. Fry then had them all three go upstairs and Ashford started figuring quantities on the paving job. Fry mentioned using gravel as an aggregate and witness told him it would be all right but there should be a test run on it. He denied ever receiving any money from Fry. On cross-examination he testified he had known Fry for fourteen years and that the relationship was friendly until a few months previous. He did not know whether Fry supported him for office or not. After Fry heard that witness was going to be a candidate he visited defendant at his place of business often—before that he had hardly ever visited him. They never discussed the paving in question at the office. Sometime after the contract was let he talked to witness about the use of gravel as an aggregate. The only reason witness talked to him was that he was a commissioner. Defendant never did think that any one commissioner was elected to any particular department. Bartlett was in charge of the department of the city government that had to do with paving. After he was elected he could not say how many times he visited with Fry at his house and at Fry's house. He remembered Fry calling him up numerous times at noon to talk about the paving. At the time of the meeting at Fry's house he was not there more than fifteen minutes and Fry and Ashford were figuring quantities. Nothing was asked in his presence about profits on the job. Mrs. Buchanan corroborated the testimony of her husband about how they happened to be at Fry's house and about how long they stayed.

In rebuttal Fry testified that when he drew the $726.50 out of the bank he told Benson that it was sugar money.

It will be seen that there was testimony on both sides of the question of fact to be determined in this cause of action. The commissioner reviewed the interest that Fry had in the outcome of the action and his animus toward defendant and concluded that defendant should not be found guilty unless the testimony of other witnesses and the facts and circumstances corroborated the testimony of Fry. He also recited the testimony of Ashford about as it has been given here and concluded it was entitled to about the same

credence as that of Fry. He found for the defendant on the issue of fact.

We hold that what was said in the case of *State, ex rel., v. Carl,* 120 Kan. 733, 245 Pac. 150, is in point here. In that case several witnesses had testified at the attorney general's inquisition in a manner very damaging to the defendant. When they took the stand before the commissioner they told a different story. They were cross-examined about the statement and the commissioner based part of his findings on what was in the statements that were used on the motion to suspend. This court in effect approved this and said:

"Many other witnesses were called by the attorney general and gave testimony to the same general effect, but when they were placed upon the witness stand before Commissioner Cunningham, some of them, and particularly Fowler, were unwilling to give the same sort of testimony they had given at the attorney general's inquisition and which was used in support of the state's motion to suspend the defendant on September 17. However, the justices' dockets, the files and the testimony of many of the persons who had been subjected to arrest and who had paid heavy sums as costs without conviction or plea of guilty and the requisite jail sentence and imprisonment attaching thereto, were examined by the commissioner, and the following is his partial summary of the facts:" (p. 739.)

The commissioner reports that when Ashford was put on the witness stand his face was blanched, his lips were trembling and he appeared to be under a great nervous strain. Well might this be true! He was about to endeavor to escape the effect of a statement formerly given under oath and at the same time to avoid committing perjury—always a difficult feat. Better men than he have tried it and failed. He had made a clean-cut statement to the county attorney and attorney general. This statement corroborates the testimony of Fry about the agreement as to the split of the profits and about the meeting being before the contract was let. He had told defendant about the statement and defendant had taken him to task about it in a blasphemous way. His testimony as it appears in the record is a typical example of a reluctant witness being made to testify. The first question of any importance asked him was to tell the conversation that took place there in the upstairs of Fry's house. He answered that he did not think he could do that, meaning that he could not remember. He must have given a statement of this conversation to the officers at the inquisition. It is apparent that at the outset he was taking refuge in that haven

for reluctant witnesses, a poor memory. Then he had received the idea somewhere that if it should appear that the conversation between the three occurred after the contract was let it would lessen the seriousness of its effect on defendant. Accordingly we see his palpable effort to establish the fact that he told the officers at the inquisition that the conversation took place after the contract was let rather than before, as appears in the statement. No good reason appears why officers would thus misquote a witness. Then when pressed to say that only he and Fry were in the room when the talk occurred about a split, the question was asked three times without an answer and then he said, "Well, I am not sure, but to the best of my recollection, he was gone when Bob told me he was going to give me a third." Clearly, here is a witness afraid to commit perjury and unwilling to tell the truth. Clearly, his every effort at the hearing before the commissioner was bent toward shielding defendant. As to his testimony about the conversation taking place after the contract was let rather than before, the fact is that the circumstance of the engineer and Fry figuring on the cost of different materials, which all parties agree they were doing, tends to corroborate the facts as contained in the statement made by Ashford to the attorney general rather than his testimony before the commissioner.

In cases where a public officer is accused of taking a bribe there are few witnesses, for obvious reasons. Circumstances, however slight, must be relied on and weighed for what they are worth. Thus, we have here, beyond a doubt, the check for $726.50 being withdrawn from the bank immediately after the job was finished and the payment of $360 to Ashford, which no one seems to doubt. This becomes important to us when we see that the money paid to Ashford, plus the money alleged to have been paid defendant, was just two thirds of the alleged profits. Nor can we overlook the fact that money was all drawn out of the bank on a check payable to a man in Kansas City, Mo., just the sort of transaction that would be used to cover up payment to local people in a questionable transaction. This court is not impressed, as the commissioner was, with the fact that there had been no prosecutions growing out of this transaction. While the question of whether the public would be better served by a criminal prosecution of state's witnesses than by an ouster suit is one usually for the exercise of the judgment of the officers, it may be said that if the prosecution of witnesses was concluded to be the better service to the public very few public

officers would fear ouster. One more circumstance which tends to corroborate Fry is the fact that there appears to have been a very good reason for the paving in question being turned down by the city commission when it was composed of Mayor Hobart, Commissioner Bartlett and one other. As soon as defendant became a member the project was undertaken, and while defendant stated that people living on the street to be paved were ringing his phone off the wall the mayor did not receive a call. Taking all the facts and circumstances into consideration, this court cannot agree with the commissioner that defendant did not enter into an oral agreement with R. D. Fry to use his influence and vote in his official capacity to secure from the city for Fry a contract for resurfacing the pavement on a part of Chestnut street, and did not use his influence and vote for such purpose and did not receive from Fry any money for securing any such contract, but on the contrary this court concludes that the finding should be 'that the defendant did do those things.

The second cause of action charges that defendant solicited and accepted a bribe in connection with the purchase of fire equipment.

While there is evidence to support this cause of action it is not as persuasive as that which supports causes of action 1, 3 and 5, and if this were the only charge against the defendant the evidence standing alone would hardly justify the ouster. Since a ruling on the cause of action will not affect the ultimate result in this case we shall not detail the evidence concerning it.

The third cause of action charges defendant accepted money in connection with a purchase of gas pipe to be used in the gas mains of the city.

Fry testified he had some conversations with defendant about January of 1934; that the purchase was to be about $10,000; that defendant asked how much he should get out of it, and was told about twelve or fifteen hundred dollars; that a few days later defendant told him he thought he could make a deal with John Krupp; and that Fry told him he should deal with a more reputable firm who would protect him and its own reputation. He further testified that defendant later told him he had closed the deal and was getting $785 out of it. He testified that a few days later when he was at defendant's office Krupp came in; Krupp and defendant went to the back end of the building and in a minute defendant came back and said he had $300 of Krupp's money, and that witness saw the

money but did not count it. At another conversation defendant told Fry he was sending the money to his mother and she was sending it to his brother and he was checking it out from there. On cross-examination he testified that the office where Krupp came to see the defendant is in a bigger building, and when he said they went out behind he meant they went out of the office and they were gone fifteen or twenty minutes.

Ernie Barnes testified that he worked for the Krupp Junk Company in March, 1934; that he was employed because Krupp sold some pipe to the city; that his duties were cutting pipe; that he heard a conversation between Krupp and defendant in the summer sometime; and that the conversation was as follows:

"A. Buchanan came in the office and said, 'John, I believe they have got the goods on us.'

"Q. Well, just go ahead and tell what was said. A. John said, 'Don't let them scare you.' Buchanan laughed and said, 'No, I will take care of that.'

"Q. And did you hear any further conversation there at that time? A. No, sir."

Some time after defendant was suspended Barnes heard another conversation between Krupp and defendant. It was as follows:

"A. Mr. Buchanan said, 'If one man talks, we're sunk!'

"Q. Well, what was the whole conversation there that you heard? A. That was what I heard.

"Q. Well, did John reply anything to that? A. No, sir."

He testified further that John Nelson inspected the pipe for the city, and at Krupp's order he hauled out to the job some pipe that had been rejected by the inspector. On cross-examination he testified that he worked for Krupp in February of 1935, but at that time he had trouble with him and quit; that the first time he told the story about the conversations was to the county attorney about a week before the hearing at which he was testifying; and that he told about it because Krupp gave him a dirty deal. On redirect examination he testified that all the time he was working there he kept still to protect his job. On recross-examination he testified that he went to a lawyer's office with a fellow named Fat Hamilton and told the lawyer the story, and the lawyer sent him to the county attorney; that defendant had nothing to do with his hauling the rejected pipe; that Nelson was not there all the time.

Mr. Shanahan, the city clerk, testified that there was nothing in the minutes of the city commission pertaining to the purchase of pipe; and that the amount of pipe purchased was $10,887.81. On

cross-examination he testified there was a purchase order written out before the pipe was purchased and signed C. M. Thompson. In response to questions by the commissioner he testified that Thompson was a city employee known as a purchasing agent, and there is no ordinance covering his office and that the city of Iola operates three utilities—gas, water and electricity—and Thompson does the purchasing for all of them; and that Thompson was employed for twenty years before defendant became commissioner. On redirect examination he testified that practically all the purchases are O. K.'d by the finance commissioner; that he was not sure who approved this order; that on the larger items they were usually taken up by the commission; and this purchase was very much the exception; and that it was the usual practice for the finance commissioner to approve all purchases.

The testimony of Mayor Hobart was that the city was to re-lay the gas mains as a federal project to help out the unemployed; that Bartlett and defendant said they had word from Sonken-Galamba Corporation in Kansas City that they had taken over a refinery in Oklahoma and they had a lot of used pipe that they claimed was as good as new; that they wanted him to go along to inspect the pipe, but he said he did not know anything about pipe and thought he knew as much as they did so went along; that they came back and said they had found a lot of second-hand pipe that was as good as new and the firm which owned it had to have an answer by 6 o'clock that night; that he objected to the rush when they were paying 26 cents for this pipe and could buy new pipe for 26.9 cents a foot; that at the time of that conversation he told them that Fred Denton at Arkansas City had some used pipe which he wanted to sell, and they said there would be no use in looking at it; that the next thing he heard about the pipe was when the requisition came through; that he said he thought they ought to wait for a regular meeting, but they stated it was not necessary; that the pipe started to arrive in a few days and he suggested they get a competent man to inspect it; that Bartlett suggested Ashford, but that Hobart did not think he was competent and suggested Nelson, and he was employed; that Nelson was on the job two or three weeks (it took all summer and way into the fall to complete the job); and that after Nelson quit, Ashford, the engineer, who had charge of laying the pipe, inspected it. He testified on cross-examination that the commission had Thompson write the companies for prices on new pipe;

that Bartlett and defendant reported that the pipe at Arkansas City was junk; that he does not know when Nelson quit the inspection job; that Nelson has been reëmployed by the city commission. In answer to questions by the commissioner he testified that most of the pipe bought was 3-inch pipe; that the price of new pipe was 26.9 cents a foot in double lengths; that double lengths are about twice as long as ordinary and would require about half the welding; that the pipe purchased was single; that a little of it was double strength; and that he signed the warrants and approved the claims when he knew the city was paying within nine tenths of a cent of what new pipe would cost. On redirect examination he testified that he knew when the commissioners were down in Oklahoma that Krupp had something to do with the selling of this pipe. On re-cross-examination he testified that all he knew about the pipe being single or double strength was what somebody had told him.

Fred Denton testified that the pipe he offered the city was 6-inch standard 20-pound pipe; that there are different grades of 6-inch and 3-inch pipe; that he never heard of double-strength pipe. In response to questions by the commissioner he testified that he did not quote any prices on reconditioned 3-inch or 2-inch pipe; and that he figured 35 to 50 percent off for used pipe.

Ashford testified he had known Krupp for several years; that Krupp told him he was going to put in a bid for the pipe and if there was anything he could do to help him he would appreciate it. He further testified as follows:

"He (Krupp) did not tell me he was going to pay me anything. I might have made the statement at the inquisition that John Krupp told me beforehand, 'If you feel like you can have any influence with Buchanan, I would like to sell them some pipe and I will make it right with you.' He didn't mention any name at all. After that John Krupp paid me around $100 at different times. I don't think he paid me over $10 or $15 at one time. After talking with Krupp, I told Buchanan and Bartlett that that was good pipe."

F. J. Horton testified that he had been engaged in the oil and gas business for about fifty years; that after the purchase of the pipe by the city he inquired as to the price of 3-inch standard iron pipe; that from his experience he is familiar with the price of used pipe in Iola; that he thought the fair value was from 10 to 15 cents a foot; that he had a quotation of from $17\frac{1}{2}$ to 20 cents on 6-inch pipe; that the value of 6-inch reconditioned pipe at that time in Iola was anywhere from 15 to 25 cents a foot, depending on the condition. On cross-examination he testified that the value of used pipe depends

on its condition; that he thought the price paid by the city was exorbitant; that his son-in-law had been defeated for commissioner by defendant.

Bartlett, for the defendant, testified that the pipe bought by the city was just as good as new pipe; the provision about the city being the sole judge of the pipe was written into the purchase order at the suggestion of Bartlett and defendant; that when the pipe first began to come in defendant was in the hospital and Nelson was appointed to inspect the pipe at the suggestion of Hobart; that about two or three weeks afterwards it was reported to him that Nelson got too much to drink and went home, and that he had nothing to do with discharging Nelson. On cross-examination he testified that the pipe was purchased in order to repair the gas distributing system on account of the leakage; when they looked at the pipe in Oklahoma they did not perform any tests; it did not show any pits; that they just walked along and looked at it; that Ashford, defendant, Krupp and his representative from Kansas City went with him to Oklahoma to look at the pipe; that he is charged with the duty of maintaining the gas mains of the city and wanted good pipe; that Nelson tapped the pipe and sounded it and threw the rejected pieces to one side; he did not discharge Nelson, he probably worked eighteen to twenty days; that he did tell Mayor Hobart that an answer had to be made by 6 o'clock the evening of their return.

The defendant testified that the city was asked to sponsor a CWA project and thought of renewing some of the gas mains; that the commissioners looked at the pipe at the refinery in Oklahoma; that they found 3-inch and 6-inch pipe all on overhead lines and there was quite an amount of it in stock there; that it did not look as though it had ever been used for anything; that the pipe at Arkansas City was stacked in several piles in a muddy field and they could not look at it; the reason they were anxious to get the pipe as early as possible was that it was a CWA project and they wanted to get as many men to work as quickly as possible; that after they came back from inspecting the pipe in Oklahoma they told Hobart about it, and he said, "if you and Mr. Bartlett think the pipe at Boynton is a good buy I have absolutely no objection;" that Hobart suggested that they had better call the city attorney and find out if it should go over to a regular meeting; and he did call Mr. Apt and he said a contract was not necessary;

and they all agreed it was not necessary that the purchase should go over to a regular meeting; and Apt said to write on the purchase order that the city was to be the sole judge of the condition of the pipe; that shortly after the purchase order was signed he went to the hospital and when he came back Nelson was in charge of inspecting the pipe; that he told Hobart if he was satisfied with Nelson's ability it was all right with him; that Nelson stayed on the job until election day; that he did not think Nelson was discharged; that the chief of police told him he was called over to the Hobart garage and found Nelson drunk, and that it was the last day he worked; that after that Ashford inspected the pipe; that he never told Fry that Krupp paid him any money and Krupp never paid him any. On cross-examination he testified that Krupp submitted a bid of 46½ cents on 6-inch pipe, 26 cents on 3-inch pipe and 7 to 7½ cents on 2-inch pipe, all used. The bids on new pipe were 26.9 on 3-inch and between 65 and 66 on 6-inch. After the bids were opened Silverman, the representative of Krupp, from Kansas City, told the commission what they had in Oklahoma and wanted the whole commission to go down and look at the pipe; that he went down with the others; that he did not see the inside of this pipe; when he came back he saw Hobart, but did not tell him they had to close the deal before 6 o'clock that night; that he could not say that the pipe looked at was the pipe finally purchased; that he never did talk to Fry about this deal and at that time there had not been any unfriendliness between them. On redirect examination he denied that he ever had any such conversation as testified to by Barnes; that the pipe bought was a second weight heavier than standard pipe; that he had some of the pipe weighed because Bartlett was a candidate at the election and the people were telling that he had paid practically new prices for old pipe.

J. B. Kirk testified that he had experience in buying all kinds of pipe. He examined the purchase order and said that it was a splendid contract for the city; that whether or not the city would get good pipe would depend on the inspector; that it is generally conceded that pipe that is used in an oil field is better than pipe that is used in a gas field; that there is very little relationship between the price of new pipe and used pipe; that the market price of used pipe is governed almost wholly by the law of supply and demand; that he had purchased old pipe when he could have gone out and bought a lighter new pipe for the money; that his judgment was

that the price paid for the pipe by the city was a fair price. He testified on cross-examination that if you were permitted to make a rigid inspection there would be very little difference in the price; that by rigid examination he meant a very close examination with calipers; that if the pipe had been used around a refinery it might make a difference in the condition of the pipe; that one would have to see the pipe to estimate the value of it. In response to questions of the commissioner he testified he had actually seen used pipe go above the price of new pipe. On redirect examination he testified that heavier pipe in the city of Iola would be a decided advantage because of the fact that due to the smelters in the city the pipe deteriorates fast. On recross-examination he testified that the pressure used on pipe would not have a tendency to wear the pipe.

Krupp testified that he paid 18 cents a foot for the 3-inch pipe and sold 28,000 feet of it to the city for 26 cents; that he bought the 6-inch pipe for 25 cents a foot and sold 8,000 feet of it to the city for 46½ cents a foot; that he lost $12 on the 2-inch pipe that he sold the city; that he made about $2,500 on the deal; that he figured his expense for hauling the pipe to Iola was about five or six hundred dollars; that he gave the city engineer about $100.

Mrs. Krupp testified that she was never in the office of the Krupp yard when Ernie Barnes, her husband and defendant had any conversation.

Krupp testified that he had expense with the pipe; that he had to plain end it, clean it and string it; and that he never paid defendant any money whatever.

In response to questions by the commissioner he testified that the pipe delivered to the city of Iola was tubing weighing 8½ pounds per foot; that it was second-grade pipe; that he had a man working in his office by the name of Ernie Barnes; that he never had a conversation with defendant in the presence of Barnes; that he never paid defendant any money at all, but that he paid Ashford $100; that he paid Ashford because when Nelson was no longer on as inspector the pipe got so congested that he told Ashford that if he would work Sundays and all the spare time he had he would pay him for his trouble; that he was paying the engineer whose duty it was to represent the city for inspecting this pipe; that he could see nothing wrong with that; that he never promised Ashford anything if he got the contract. On redirect examination he testified that most of the pipe was not inspected when Nelson quit.

John Nelson testified that he was employed to inspect pipe used in relaying the gas main; that along in March he understood Krupp to say "that finishes the order" and he thought he was done; that it was necessary to take a gunnysack and wipe the dirt and oil off the outside of the pipe and swab it out; that before this was done it was impossible to catch all the defects; that Krupp told him that he would call him when the pipe arrived, but he did not call him. On cross-examination he testified that he did not know defendant when he started working for the city; Ashford hired him to work for the city; that nobody told him any specifications except that Shanahan told him what was on the bottom of the purchase order; that the city was the sole judge; that he turned the pipe down that was not smooth and satisfactory to him and that on election night he had been drinking and the chief of police came and took him home.

In response to questions by the commissioner he testified that the still tubes that he was inspecting weighed more than 7.575 pounds to the foot; that he never weighed them because they were beyond the required weight per foot; about thirty percent of that sort of pipe was inspected and passed, and that he passed nothing but good pipe.

Frederick G. Apt testified that he did not advise defendant that they could buy that pipe without a contract or without a commissioner's meeting.

On that record the commissioner found all the issues in favor of defendant. We will examine the evidence.

Fry testified as to the statement by defendant that Krupp was to give him $785. He also testified to seeing Krupp come to the office of defendant, and that defendant said at that time he had $300 of Krupp's money. If this should be believed it would be sufficient of itself to justify ouster of defendant. On account of the apparent interest of Fry we will examine the surrounding facts and circumstances with the idea of finding whether Fry's testimony is corroborated. The two conversations testified to by Barnes furnish some corroboration. We now must not only wave aside the testimony of Fry, but must do the same thing with Barnes' testimony. The conversations sworn to by Barnes have the ring of naturalness. They are about what a man would say under such circumstances. Defendant ridicules the idea that men would have such a conversation in the presence of a third person, but for aught this record shows the circumstances might have been such that the speaker did not

notice the presence of Barnes. In order to believe the story of defendant, this court is asked to disbelieve too many people. There is the further circumstance of the payment of $100 to Ashford. Fry testified that in the early conversations defendant told him that Ashford would have to have $100. There seems to be no dispute but that Ashford received this. Surely this is a circumstance that is entitled to some weight. A small circumstance that must be considered is the fact that both defendant and Bartlett wanted to close the deal for the pipe by six o'clock of the night they returned. It is true they both denied this, but no reason appears why Hobart would swear falsely in this case. The fact that they both thought this important enough to deny causes it to assume more importance in the case than if they had offered some explanation. The undue haste shown by them in their action in buying the pipe without a meeting of the commissioners throws a shadow of suspicion on the whole transaction. That brings us to a consideration of the most damaging circumstance of all—the price paid for the pipe. Used three-inch pipe was bought for only nine tenths of a cent less per foot than new pipe could have been bought. A great deal is made in the record about the fact that this pipe was about a pound per foot heavier than standard, but the trouble with that is that defendant himself does not testify that he knew this at the time the purchase order was signed. In fact, no examination of the pipe that would have enabled him to determine this was had. Indeed, the bid does not specify anything as to the weight, while the bid offered by other parties was for standard pipe. In connection with this must be considered the mystery of what happened to Mr. Nelson. Ernie Barnes testified that he hauled out to the ditch some pipe that Nelson had rejected. Whether the city suffered by this purchase depended on whether this pipe was carefully inspected before it was put in the ground. Some action towards this end was taken when, pursuant to the suggestion of Mayor Hobart, Nelson was given that job; but after three weeks he suddenly disappeared. Apparently nobody knew what happened. Nobody would say they caused his discharge, but the fact remained that he was no longer on the job with most of the pipe yet to be inspected. On the other hand, the ubiquitous Ashford appeared and took over the job, receiving money all the while from the man to whose interest it was that the pipe should all be accepted and paid for. The fact is that had not the pipe been purchased from a

junk dealer instead of from a regular dealer for a few cents a foot more there would have been no need of a Nelson or any other inspector, and the opportunity for a large profit would not have been so great. The manner in which the contract was made and the way in which it was carried out all point to the conclusion that the contract was the sort of one which the party to be benefited would be willing to have executed. We have concluded that the finding of the commissioner on this cause of action should have been for the plaintiff.

In the fourth cause of action the defendant is charged with accepting a bribe in connection with the purchase of some waterworks equipment. As to this cause of action we have reached the same conclusion as expressed heretofore in this opinion with reference to the second cause of action.

In the fifth cause of action defendant was charged with having accepted a payment of money in connection with the purchase of land by the city for a swimming pool. The commissioner found the issue of fact on this charge in favor of the defendant. We will examine the record.

In this cause of action Fry testified that along in February, 1934, he had a conversation with defendant with reference to the city purchasing Riverside Park; that he told him there would be $1,000 in it which they would split; that later he told him there would only be $500 in it, which he offered to split with defendant; that he talked with F. O. Benson at the Iola State Bank; that the city bought the real estate in March, and he took defendant his $250. He also testified as follows:

"Q. Did you draw the money out of your bank account? A. No.

"Q. Well, you may state just what you did in connection with the obtaining of that money. A. He (Benson) called at my home and told me to come up to the bank. I did so. When I went in, he told me he had deposited two hundred and fifty dollars ($250) to my account, had the deposit slip all made out and gave it to me. No, I will rescind that statement. He said he had deposited five hundred dollars ($500) to my account and he asked me how I wanted the other two hundred and fifty dollars ($250). I told him in cash. He went in and made out a check, brought it back and I signed it. He went and got the two hundred and fifty dollars ($250) in cash."

He further testified that the check was made on his account in which had been deposited $500, of which he kept $250; $250 he gave to defendant. On cross-examination he testified that the site of

the fairground was selected by a committee appointed by the city commission; that he got $500 for a real-estate commission; that Buchanan was not present when he had his talk with Benson; that he did not think Benson knew where the money which was paid went; that it was paid with the understanding that it was going some place; that the money was withdrawn on a check but he had lost the check; that defendant was in his office when the money was paid and he said, "Can I use that?"

Jesse Benson testified that on March 16 Fry's account was overdrawn $7.72; that on March 17 there was an additional check for $2, which, with the 2-cent tax, would make the overdraft $9.74; that the next entry is April 5, 1934, when the record shows thirty-nine checks ranging from one dollar to twenty, most of them for a dollar or two; that the last check was for $2 and 78 cents tax; that these checks were all presented to the bank the same day; the ledger sheets show a deposit on April 5 of $350 and another deposit of $150; that on April 6 the ledger sheets show checks for $250, $3, $3, $3, and tax six cents; and that the $250 check was not taxed; that this fact would indicate that this was what is called a counter check; that he never had any conversation with Fry about holding these checks; that he cannot say whether all the checks were presented on the same day; that it is unusual to have an account inactive for a long time and then have 39 checks presented on the same day; that he would not want to testify positively that some of these checks were not held for cash items. Prior to April 5, 1934, the Allen County Fair Association owed the bank $5,590.30; that on that date the obligation was paid; that the amount had been built up over several years; that on April 5 the Allen County Agricultural Society gave a new note for $150.

Shanahan testified that exhibit 32 was the resolution of the board of commissioners accepting the offer of the Agricultural Society to sell the land and assuming the indebtedness of $12,160 and appropriation of the money from the electric fund; that exhibit 34 is a copy of the claim of the Agricultural Society for $5,700 on note; that exhibit 34-A is a city warrant for $5,700 showing payment by perforation; that exhibit 34-B is a copy of a note dated December 9, 1933, for $5,590.30; that exhibits 35 and 35-A are claims of the Iola Building and Loan Association and city warrant for $6,460.

Bartlett, for the defendant, testified there was a question about where the swimming pool should be located; that he and the mayor

and defendant looked around and finally decided to call in a lot of men and to let them decide and they finally decided that Riverside Park was the best place; that part of the land was owned by the city and part by the Agricultural Society. On cross-examination he testified the land bought for the city adjoins land already owned by the city and that he thought it was a good buy.

Defendant testified that the committee voted to put the swimming pool in Riverside Park; that a representative of the Agricultural Society appeared before the commission and offered to give the commission the land down there if the city would assume the indebtedness; that after the grant was made of money to build the swimming pool there had to be a location for it, so the deal was made; that he never had any conversation whatever with Fry about the ground; that he came and wanted the engineer's estimate of the cost before the contract was let and he would not tell him; that Fry wanted to know so he could bid just under the estimate; that a man named Northrup advised him that it would be a good idea for the city to do the work and not have a contract, but that on account of it costing Chanute $20,000 extra to build a swimming pool by that method, he refused. On cross-examination he testified that he thought Doctor Beattie and Mr. Klein presented the proposition about the sale of the real estate to the city; that Klein owns the Klein Lumber Company; is a member of the Fair Association and he thought a director of the bank.

Cedric Wilson testified he was engineer for the proposed swimming pool; that he was present in the commission room when the proposition of buying the land first came up; that there were present three city commissioners, the city attorney and the city clerk and himself; that Hobart was opposed to buying any more land and defendant was opposed to purchasing the land; that in the general conversation the city attorney was in favor of purchasing the land, and his impression was it was the city attorney's remarks that swung defendant over to buying the land.

F. O. Benson testified he was president of the Iola State Bank; that he knew R. D. Fry; that he never had any dealings with R. D. Fry with reference to the sale of land for the city; that the bank had a note of the Agricultural Society for about $5,590 principal; that the financial worth of the indorsers on the note was $200,000. On cross-examination he testified he did not remember any conversation with Fry about the sale of the land; that it is not a fact

that he and defendant talked the matter over in the rear of the bank; that he and Fry and defendant had talked things over in the rear of the bank many times, often about the swimming-pool contract; that he did not hold out any checks of defendant; that Fry did not tell him what the check for $726 was for; that he made out two deposit slips for Fry for something like $500; that he did not hold any checks for Fry and they are not in the habit of doing business that way; that many business men call up and ask whether a check is good and sometimes they just hand a check in and say when this is good take the money out and pay it; that he never had any conversation with Fry about the sale of the land; and he further testified as follows:

"Q. Now under expense here on the original that you have here, it appears that on this day of April 5, 1934, there is the handwriting of two different persons. A. First two items are in the handwriting of my son, Jesse Benson, cashier of the bank. The one item of $250 is in my handwriting."

On recross-examination he testified that two officers or directors of the bank were indorsers of the note of the Agricultural Society; that there was $125 paid on the note on the day that Fry deposited the $500 in the bank.

In response to questions by the commissioner he testified that the fact that he made out the two deposit slips—one for $150 and one for $350—did not mean that he made the deposit; the item of $250 on April 5, 1934, is in his handwriting and was paid to G. R. Gard, attorney for the bank; that one note was for $125; that it was paid in full on April 5, 1934. On recross-examination he testified that he did not have a receipt for the $250 that appears on the exhibit as expense; that he had had a receipt for it but could not find it; that he thought perhaps the county attorney had carried it away; the receipt was not prepared a month before, as shown on the ledger sheet; that the perforations showed that the receipt was issued the month before and this was probably caused by the clerks in the morning when they turned the stamp machine up turning the day instead of the month; that the receipt showed on its face that it was Mr. Gard's official receipt as having been paid April 5, 1934; and that was written on the receipt in ink while the rest of it was written on a typewriter. On redirect examination he testified that the $250 was paid to Gard in cash; that on the same day the Agricultural Society borrowed $150 from the bank, and that he could not recall whether they told him what they wanted it for or not.

In rebuttal Fry testified that on April 5, 1934, F. O. Benson called him down to the bank and told him he had just deposited $500 to his credit and asked how he wanted the other half, and when Fry said "in cash" he went in and got $250 and brought it with a rubber band around it, rolled up; and that he took it and gave it to defendant.

Frederick G. Apt, city attorney, testified he did not advise defendant the city could use the money from the sinking fund to buy the land.

A. M. Dunlap testified for the state on rebuttal that he was director and vice-president of the Agricultural Society; that he signed the note for $5,590 as vice-president and indorsed it personally; that the directors were all supposed to sign it, but they did not all do it—four of them were not on there; that the bank wanted the note paid; that he received a notice from the bank addressed to A. M. Dunlap as president of the Agricultural Society, although he was not president, and to him personally stating that the bank demanded payment of the note; and that the banking department had been making demand for the payment of the note.

On the above evidence the commissioner found the facts in favor of the defendant.

If the testimony of R. D. Fry is believed the facts should be found for the state. Fry testified that the money was paid to defendant; the defendant denied this. Enough has already been said in this opinion about the interest of these two witnesses. We do not see as much reason for doubting the veracity of Fry as there is for doubting the veracity of defendant. Since it is the sort of a case where direct evidence of the actual transaction is difficult to obtain, we must have recourse to what facts and circumstances are available. To begin with, it is perfectly evident that the city engaged in a doubtful transaction when they bought the land. (See *City of Iola v. Hobart*, 141 Kan. 709, 42 P. 2d 977.) There is some evidence that the transaction was the sort of one wherein the commissioner who wielded the influence on the commission would be apt to take a bribe. The next important circumstance is the fact that the bank was demanding payment of the note in spite of the fact that one of the bank's witnesses testified the financial worth of the indorsers on the note was $200,000. We find the bank writing sharp letters to one of the signers demanding payment and resorting to that final threat of all bankers—that the banking department was

demanding that the note be paid. There appears no reason for doubting the testimony of Dunlap on this point. Clearly the bank had a note among its assets which it was anxious to get rid of, and securing the sale of this land would accomplish that end without the embarrassment of bothering any of the indorsers. A final determination of the matter requires a consideration of the records of the bank. The testimony of Fry was that under the agreement he was to receive $500 from the bank when the land was sold and that his agreement with defendant was that the defendant was to get half. The president of the bank at first denied having any conversation with Fry and defendant, and then admitted he had many conferences with them in the bank, a circumstance which at the outset requires a careful scrutiny of their testimony. The next bit of circumstantial evidence is the condition of the account of Fry. On March 17 the entry on this account shows an overdraft of $9.74. The next entry is on April 5, when 39 checks in amounts from $1 to $20 were all cashed on the same day. The cashier testified these checks had been held as cash items in the bank until the account of Fry was in such a condition that they could be charged against it. The president of the bank, while not so candid as his son, the cashier, admitted under cross-examination that this was probably true, a most surprising occurrence and one which persuades us that the bank expected Fry to have his money soon. On the day these checks were cashed the real deal was finally consummated and there was a deposit in the account of Fry of $350 and another for $150—just enough to make the $500 deposit which Fry testified the banker told him was deposited on that day. On the same day the note of the Agricultural Society for $5,590.30 was paid and a new note for $150 of the society was given. The fact that the society was interested in selling this land; that some officers of the bank were officers of the society and that $150 was deposited in Fry's account—just what was needed to make it total $500, the amount which he testified was deposited in it by the banker—makes a chain of circumstances which go far in persuading this court that the story testified to by Fry was true. There is the added circumstance that these two deposit slips were made out in the handwriting of the president of bank. Fry testified that the banker told him he had deposited $500 for him in the bank, and on that day two deposit slips in the handwriting of that official appear in the records of the bank, a circumstance which taken by itself would not be so signifi-

cant, but when considered along with other facts and circumstances is persuasive. Nor is that all. Fry testified that Benson, the banker, asked him how he wanted half of the deposit, and he said in cash, whereupon Benson went back and came out with $250 in bills. The records of the bank show that on April 6 there were four checks drawn on Fry's account—one for $250 and three for $3 each, with a tax of 6 cents. This indicates but one thing—the three $3 checks were handled through the regular channels of the bank; the imposition of the tax of 2 cents each proves that; while the withdrawal of the $250 was done either by what is called a counter check or through some interior channels of the bank; it might have been one of the other checks that was handled that way, but in this record the man whose account that was, testified that $250 was drawn from his account in that manner and a circumstance such as this is some corroboration. Another circumstance which is worthy of note is the fact that on April 5 there was an entry of $250 in the teller's cash account of the bank. This appears in the handwriting of the president. That officer of the bank testified that this payment was made in cash to a lawyer for a fee and that the bank had the lawyer's receipt for this amount. The receipt had disappeared between the time of the inquisition and the trial. It showed the date of April 5 indorsed in ink on its face and a date of a month later by the perforations made by a machine in the bank. The fact that the lawyer to whom the money was said to have been paid was not called to state what services he performed, that the transaction was in cash and that there was something queer about the receipt, point to a conclusion that this was the method used by the bank to account for $250 of the deposit of $350 that was made to the account of Fry on the same day.

After a consideration of the record on this cause of action we have concluded the finding should have been in favor of the state.

We are aware that we have thus reached a conclusion on the first, third and fifth causes of action in the petition, different from that reached by the commissioner. Our duty, however, bids us examine the entire record, weigh evidence and reach our own conclusion as to the facts. Our examination of this record impels us to the conclusion already announced.

The judgment of this court is that ouster of the defendant be ordered.

HUTCHISON, J., dissenting.