No. 34,791

OALAND GRAHAM, JR., by ULYSSES A. GRAHAM, His Next Friend, *Plaintiff,* v. THE BOARD OF EDUCATION OF THE CITY OF TOPEKA, A. J. STOUT, Superintendent of Public Schools, and CHARLES S. TODD, Principal of Boswell Junior High School, etc., *Defendants.*

(114 P. 2d 313)

Opinion filed June 13, 1941.

*Tinkham Veale* and *William M. Bradshaw,* both of Topeka, for the plaintiff.

*J. L. Hunt, Lester M. Goodell, Margaret McGurnaghan, John H. Hunt* and *George M. Brewster,* all of Topeka, for defendants.

The opinion of the court was delivered by

ALLEN, J.: This is an original proceeding in mandamus in which the plaintiff seeks to compel the defendants to admit plaintiff as a student to the 7B grade in Boswell junior high school in the city of Topeka. After defendants had answered, evidence was submitted to a commissioner appointed by the court. The commissioner made findings of fact and conclusions of law and decided that the writ of mandamus should not issue. Plaintiff then moved the court to set

aside the findings of fact and conclusions of law of the commissioner and for judgment in favor of the plaintiff. Defendants filed a motion to confirm the report of the commissioner and for judgment in their favor.

We quote from the findings of fact made by the commissioner:

"1. That the plaintiff, Oaland Graham, Jr., is a colored boy, twelve years of age (when this suit was filed), residing with his mother, Beatrice Graham, at 1418 Munson avenue, Topeka, Kan., which is within the district designated by the defendant Board of Education and superintendent of public schools of Topeka, Kan., as the district which is served for junior high-school purposes by the Boswell junior high school.

"2. That the defendant Board of Education of the city of Topeka is a body corporate and politic consisting of six members; and the defendant, A. J. Stout, is the duly elected, qualified and acting superintendent of public schools of the city of Topeka; and the defendant, Charles S. Todd, is the duly appointed, qualified and acting principal of Boswell junior high school.

"3. That the plaintiff on January 26, 1940, was promoted from the sixth grade of the elementary school in Topeka known as Buchanan school, and thereafter on January 29, 1940, duly presented himself to the defendant, Charles S. Todd, as principal of Boswell junior high school, for enrollment in the seventh grade of that school, and was at that time denied and refused the right to enroll in said school by said principal and by the defendant Board of Education on account of his race and color.

"4. In the district served by Boswell junior high school white pupils receive their first six years of public-school instruction in one of the several elementary schools in said district, then attend Boswell junior high school for the seventh, eighth and ninth years of instruction (referred to in the evidence as seventh, eighth and ninth grades), and then attend the Topeka high school for the last three years of their public-school instruction.

"Colored pupils in said district attend Buchanan school for their first eight years of public-school instruction, upon completion of which they then attend Boswell junior high school or Roosevelt junior high school for one year, or the ninth grade, and then enter the Topeka high school for their last three years."

There are two principal questions in this case. Plaintiff argues: (1) Boswell junior high school is a high school within the meaning of G. S. 1935, 72-1724, and that therefore the white and colored races cannot be separated; (2) the educational facilities offered to colored children at the Buchanan school are not equal to those offered to white children in the 7B grade at the Boswell junior high school and that the refusal to admit plaintiff to the Boswell junior high school was a denial of plaintiff's constitutional rights as guaranteed by the fourteenth amendment to the constitution of the United States, and section 1 of the bill of rights of the constitution of the state of Kansas.

The commissioner in his conclusions of law answered these questions as follows:

"1. That the seventh and eighth grades of public-school education, whether housed and taught in Boswell junior high school or elsewhere, in Topeka, Kan., are not a part of a 'high school' within the meaning of G. S. 1935, 72-1724, authorizing school authorities in cities of the first class to maintain separate schools for the education of white and colored children.

"2. Under the evidence in this case it does not appear that there is any discrimination against the plaintiff on account of his race or color, or that he has been denied substantially equal educational opportunities with those enjoyed by white pupils in the school in which he seeks admission.

"3. The writ of mandamus prayed for by the plaintiff herein should be denied."

It should be remembered that in original proceedings such as this, the findings of fact made by a commissioner are advisory only and do not have the finality which is accorded to the findings of a trial court when on appeal its judgment is reviewed in this court. (*Hunt v. Gibson,* 99 Kan. 371, 375, 161 Pac. 666; *State, ex rel., v. Buchanan,* 142 Kan. 515, 51 P. 2d 5.) Nevertheless, there is little dispute as to any question of fact in this case. Such facts as are necessary will be noted below.

The court desires to take up first plaintiff's second proposition—the question of discrimination. The authorities are clear that separate schools may be maintained for the white and colored races if the educational facilities provided for each are equal unless such separation is in contravention of specific state law. A comprehensive statement of the law upon this matter is found in the case of *University v. Murray,* 169 Md. 478, 182 Atl. 590, 103 A. L. R. 706, where it is said:

"As a result of the adoption of the fourteenth amendment to the United States constitution, a state is required to extend to its citizens of the two races substantially equal treatment in the facilities it provides from the public funds. 'It is justly held by the authorities that "to single out a certain portion of the people by the arbitrary standard of color, and say that these shall not have rights which are possessed by others, denies them the equal protection of the laws." . . . Such a course would be manifestly in violation of the fourteenth amendment, because it would deprive a class of persons of a right which the constitution of the state had declared that they should possess.' (*Clark v. Maryland Institute,* 87 Md. 643, 661, 41 A. 126, 129.) Remarks quoted in argument from opinions of courts of other jurisdictions, that the educational policy of a state and its system of education are distinctly state affairs, have ordinarily been answers to demands on behalf of nonresidents, and have never been meant to assert for a state freedom from the requirement of equal treatment to children of colored races. 'It is distinctly

a state affair. . . . But the denial to children whose parents, as well as themselves, are citizens of the United States and of this state, admittance to the common schools solely because of color or racial differences without having made provision for the education equal in all respects to that afforded persons of any other race or color, is a violation of the provisions of the fourteenth amendment of the constitution of the United States.' (*Piper v. Big Pine School Dist.,* 193 Cal. 664, 226 P. 926, 928; *Board of Education v. Foster,* 116 Ky. 484, 76 S. W. 354; *Ward v. Flood,* 48 Cal. 36.)

"The requirement of equal treatment would seem to be clearly enough one of equal treatment in respect to any one facility or opportunity furnished to citizens, rather than of a balance in state bounty to be struck from the expenditures and provisions for each race generally. We take it to be clear, for instance, that a state could not be rendered free to maintain a law school exclusively for whites by maintaining at equal cost a school of technology for colored students. Expenditures of this state for the education of the latter in schools and colleges have been extensive, but, however they may compare with provisions for the whites, they would not justify the exclusion of colored citizens alone from enjoyment of any one facility furnished by the state. The courts, in all the decisions on application of this constitutional requirement, find exclusion from any one privilege condemned. (*State v. Duffy,* 7 Nev. 342; *Tape v. Hurley,* 66 Cal. 473, 6 Pac. 129; *Marion v. Territory,* 1 Okla. 210, 32 Pac. 116; *State v. Board of Trustees,* 126 Ohio St. 290, 185 N. E. 196; *State v. McCann,* 21 Ohio St. 198; *People v. Gallagher,* 93 N. Y. 438; *Wong Him v. Callahan,* [C. C.] 119 Fed. 381; *Puitt v. Gaston County Commissioners,* 94 N. C. 709; *Bonitz v. Board of Trustees,* 154 N. C. 375, 70 S. E. 735. See notes, reviewing decisions, 32 Law Notes, 147, 149, Ann. Cas. 1915C, 482.)

"Equality of treatment does not require that privileges be provided members of the two races in the same place. The state may choose the method by which equality is maintained. 'In the circumstances that the races are separated in the public schools, there is certainly to be found no violation of the constitutional rights of the one race more than of the other, and we see none of either, for each, though separated from the other, is to be educated upon equal terms with that other, and both at the common public expense.' (*Ward v. Flood,* 48 Cal. 36, 51; *Gong Lum v. Rice,* 275 U. S. 78, 48 S. Ct. 91, 72 L. Ed. 172; *State v. McCann,* 21 Ohio St. 198; *People v. Gallagher,* 93 N. Y. 438; *Roberts v. Boston,* 5 Cush. [Mass.] 198.)

"Separation of the races must nevertheless furnish equal treatment. The constitutional requirement cannot be dispensed with in order to maintain a school or schools for whites exclusively. That requirement comes first. See review of decisions in note 13 Ann. Cas. 342. . . ." (p. 483.)

Under the facts of this case it is shown that white children in the city of Topeka are provided with what is known as the 6-3-3 system of education; that is, six years of elementary or grade school, three years of junior high school and three years of senior high school. Colored children are educated under a system which might be referred to as the 8-1-3 plan. They go to grade school through the

first eight grades, then to the same junior high schools attended by the white children for the ninth year and also attend senior high school with the white children.

Plaintiff's argument is that he was denied the right to have his education in the 7B grade in a junior high school simply because he was a negro; that he was compelled to obtain his education in Buchanan school, which is what is commonly known as a grade school and is run on the well-known grade-school system. Plaintiff makes no claim nor does the evidence show that the teachers of Buchanan school were in any way incompetent as grade-school teachers, nor that the school was not a well-conducted grade school.

The plaintiff points out a great many differences in the system of operation of the junior high school and that of the grade school.

Plaintiff stresses that the junior high school is conducted under a departmentalized plan. Under this system teachers are assigned to teach courses in one or two branches in which they have had special training. Thus, in the 7B grade at Boswell junior high school the students are taught nine subjects by nine different teachers. In the Buchanan school, where the 6A, 7B and 7A grades are all in one room, the one teacher teaches twenty-eight different subjects, ten of these subjects are 7B courses. In Buchanan school, in the room in which the 7B grade is located, it is necessary for two of the classes in that room to study while the other class is reciting in the same room. In Boswell the class periods are approximately fifty-two minutes long and are divided into a study period and recitation period; there is no other class in the room during the class period. It is true there is a domestic-science teacher and a manual-training teacher at Buchanan school to whom the pupils go at stated times for instruction, but this does not change the general system employed in the school.

There are other facilities and advantages afforded the students at Boswell junior high school which are lacking in Buchanan school. Because of the departmental organization, a student who fails in only one subject is required to take only that subject over. In Buchanan school he would be required to take the entire year's work over. Boswell junior high school has a standard high-school gymnasium with adequate shower bath rooms. The junior high school takes part in a city-wide junior high-school athletic league, has an athletic coach and an assistant coach. It is true as pointed out by defendants that the coaches also teach other subjects in the junior

high school. In Boswell students had the opportunity of playing in a school orchestra and receiving instruction in instrumental music. In Buchanan there is no opportunity for instruction in instrumental music. Defendants point out that it is necessary for a student in Boswell to own his own instrument and to have acquired sufficient ability to warrant his receiving this instruction before it is accorded to him. Obviously in any school not all the students would be capable or desirous of playing in an orchestra. The system of grading differs in the two schools. In the junior high school, pupils are graded according to the manner in which they measure up to a standard of excellence for all students. In the grade school, students are graded under a system in which they receive a grade of "satisfactory," "unsatisfactory," and "not passing," based upon a supposed estimate of their personal effort and capacity. In the Boswell school there is an auditorium, while in Buchanan there is none. It is true that there are two rooms in the Buchanan school which can be thrown together and used for school assemblies and functions and that a movable stage is made available to the school by calling the Board of Education when it is desired.

The defendants argue that all of the matters above noted result only from the fact that the Boswell junior high school is a bigger school than Buchanan school; that it can be argued that the departmental system of teaching is no better than the so-called grade-school system, that the graduates from Buchanan school show no inferiority in ability and education when they enter the ninth grade in Boswell; that many of the facilities found in the junior high school are simply extracurricular activities and do not constitute discrimination.

The court has reached the conclusion that the position of defendants is untenable. It appears clear that the educational facilities offered at Boswell junior high school do not differ from those at Buchanan school except in size and capacity of the building and equipment, which might well be found where one school has a considerably larger student body than the other. It is apparent that a different system of teaching is employed in the two schools. Common observation as well as the evidence in this case shows that the junior high-school method of departmentalization is considered to be an advanced and improved method of education. No one instructor can be as proficient in teaching all courses of study as he is in the particular branches in which he has special interest and training.

The departmental system has been in use in senior high schools and colleges for many years. The idea of the junior high school has been to apply this method of teaching to the 7th and 8th grades as well as to the higher grades.

It will not do to say to one American citizen, you may not have the benefits of an improved method of education because of your race, when at the same time other citizens in the same school district are being accorded those benefits.

The defendants cite the case of *Reynolds v. Board of Education,* 66 Kan. 672, 72 Pac. 274. The rules of law set out in that case are sound and are applied in this case. In that case complaint was made because the white children were furnished a larger schoolhouse than the colored children. But the white children were more numerous than the colored children and there was nothing in the Reynolds case to show that the methods of education differed in the two schools nor that the smaller schoolhouse did not furnish just as adequate educational facilities of the same character to the smaller group of pupils as were furnished to the larger group of pupils by the larger schoolhouse. It was held that Reynolds could legally be denied admission to the larger school.

In *Williams v. Parsons,* 79 Kan. 202, 99 Pac. 216, the court held that colored children could not be excluded from a school near their place of residence and compelled to attend a colored school which was placed near numerous railroad tracks and where it would be necessary for the children to cross many of these busy railroad tracks on their way to and from school.

Among the reasons which caused the supreme court of Oklahoma to find that an unlawful discrimination existed between white and colored school children under the facts in the case of *Jones v. Board of Ed. of Muskogee,* 90 Okla. 233, 217 Pac. 400, was that the curricula of the white schools included blacksmithing, auto repairing, printing, electric wiring, architectural and mechanical drawing, banking and commercial courses, kindergartens, handcrafts, cartooning, lettering and commercial art, and bands, none of which were included in the curricula of the colored schools.

In the recent case of *Missouri, ex rel. Gaines, v. Canada,* 305 U. S. 337, 83 L. Ed. 208, the supreme court of the United States, in reversing a decision of the supreme court of Missouri, said:

"The admissibility of laws separating the races in the enjoyment of privileges afforded by the state rests wholly upon the equality of the privileges

which the laws give to the separate groups within the state. The question here is not a duty of the state to supply legal training, or of the quality of training which it does supply, but of its duty when it provides such training to furnish it to the residents of the state upon the basis of an equality of right. By the operation of the laws of Missouri a privilege has been created for white law students which is denied to negroes by reason of their race." (p. 349.)

The school authorities of the city are not required to furnish the benefits of a departmentalized junior high school to its residents, but they cannot be furnished to white children residing within a particular district and be withheld from negro children residing in the same district and having equal qualifications because of their race. Further authorities are collected in the annotation appearing in 103 A. L. R. 713. The case of *State, ex rel., v. Wirt*, 203 Ind. 121, 177 N. E. 441, cited by defendants, is readily distinguishable from this case.

The first proposition advanced by plaintiff that the 7B grade as taught in Boswell junior high school is a high-school grade and that the provisions of G. S. 1935, 72-1724, prohibiting the separation of the races in high schools, govern this case will be noticed briefly. There was evidence by witnesses well qualified in the field of education that the 7B grade as taught in junior high schools was a grade in a secondary school. But in the words of Professor Chandler of Kansas University who was one of plaintiff's witnesses: "I don't think that the terms high school and secondary school are synonymous." This is especially true when it is considered that the meaning of the word high school with which we are concerned is the meaning used by the legislature in the statute.

As early in the history of the state as the compiled Laws of 1862, ch. 46, art. 4, the legislature provided that the races might be separated in the schools of the state. The same authority was given in the Laws of 1868, ch. 18, sec. 75, but when the school laws were recodified by the Laws of 1876, ch. 122, the provision for separation of the races was omitted. By the Laws of 1879, ch. 81, sec. 1, provision for separation of the races *except in high school* was enacted. This section was amended by Laws of 1905, ch. 414, sec. 1, and now appears without further change in G. S. 1935, 72-1724. Since the first junior high school in the United States is shown by the evidence to have been established in 1910, it would appear that the legislature could not have had junior high schools in mind when either the statutes of 1879 or of 1905 were enacted. The statute passed in 1925

and appearing as G. S. 1935, 72-40a01, authorized the establishment of junior high schools, but would seem to have no bearing on this case.

It would seem to be established that the legislature by the use of the word high school in this statute meant to include the grades commonly recognized as high-school grades, namely, the 9th, 10th, 11th and 12th grades.

In *Thurman-Watts v. Board of Education,* 115 Kan. 328, 222 Pac. 123, this court held that the 9th grade in a junior high school was a high-school grade within the meaning of the above statute.

The contention of plaintiff that the 7B grade is a high-school grade within the meaning of G. S. 1935, 72-1724, and that the statute therefore prevents a separation of the races, cannot be sustained.

Because of the conclusions already reached, other matters discussed in the briefs need not be noticed.

While in the form of mandamus, the real purpose of the action is to determine the right of plaintiff to attend the seventh and eighth grades in the junior high school. We conclude he has that right. No writ will issue at this time, but the court retains jurisdiction of the cause for such specific orders as may be necessary.

HARVEY, J. (concurring in part, dissenting in part): I concur in the judgment rendered and in the conclusion reached in the first paragraph of the syllabus. My views respecting the question ruled upon in the second paragraph of the syllabus may be stated as follows: Counsel argue we should determine the specific thing the legislature had in mind by its use of the words "high school" in chapter 414, Laws 1905, now G. S. 1935, 72-1724, and the evidence and argument center around what constituted a high school in 1905. The act of 1905 specifically amended chapter 81, Laws of 1879, which specifically amended section 75 (art. V), chapter 18, General Statutes of 1868. This was a comprehensive act relating to cities of the first class, article V of which created boards of education for such cities and prescribed their powers and duties. This section reads:

"The board of education shall have power to select their own officers; make their rules and regulations, subject to the provision of this act; to organize and maintain separate schools for the education of white and colored children; to establish a high school whenever, in their opinion, the educational interests of the city demand the same; and to exercise the sole control over the public schools and school property of the city."

If this court is to determine what the legislature meant by the words "high school" the time of such determination should be 1868 rather than 1905. Respecting authority of the board of education to maintain separate schools for white and colored children this statute of 1868 has been amended but twice—in 1879, when the authority of such boards of education to maintain separate schools for white and colored children was taken away as to high schools; and in 1905, when that authority was granted to Kansas City, Kan., but specifically withheld in all other cities.

Neither the evidence nor the argument in this case pertains to what the legislature must have had in mind by the words "high school" in 1868. The statute above quoted authorized the board of education to organize and maintain schools and to establish a high school whenever in the opinion of the board of education the educational interests of the city demanded it.

During all the time since 1868 the defendant board of education has had statutory authority to organize and maintain the city schools. The statute has not at any time specified how pupils shall be classified or graded, or what departments shall be used, or what classes or grades shall constitute the high school, if one is maintained. All these matters were left to the board of education. (See *Board of Education v. Welch*, 51 Kan. 792, 804, 33 Pac. 654, decided in 1893.) At that time defendant was maintaining four departments—a primary department, an intermediate department, a grammar school department, and a high school department. This last started at what defendant had classified as the ninth grade. When that system of classification and of departments was started, and when defendant ceased using it, is not shown in this record and may not be important except as it helps to demonstrate that no statute required the use or the disuse of such a classification. The board of education, with the aid of its superintendent, principals and teachers, made such classes, grades and departments as it deemed best. Had it started its high school at the seventh grade, as it graded students, it would have been within its rights under the law. It may be worth noting that in the 1870's and 1880's classes or grades of the common schools were built around the readers used (see pp. 6-16, Report of State Superintendent, 1871), and usually consisted of five grades, and in 1886 (Laws 1886, ch. 147), when the first general statute authorizing county high schools was enacted it was provided, in section 12, that no person should be admitted to such high school who had

not passed a satisfactory examination in the work of the district schools of the county in which the high school was situated. The county high-school system became the bulwark of the high-school education of the state. (Report State Superintendent, 1923-1924, p. 7.) So to start a high school at even as early as the sixth grade was neither unheard of nor unlawful.

In 1925 the legislature passed an act (Laws 1925, ch. 240, now G. S. 1935, 72-40a01) which reads:

"Any board of education or board of any school district in this state is hereby authorized to provide for an intermediate school or junior high school, which shall be called a 'junior high school,' and which shall include two or more of the first three years immediately following the first six years of school instruction. The state board of education is authorized and directed to prescribe a course of study for each year of such junior high school and provide regulations for teaching therein, and the state schoolbook commission is hereby authorized and directed to approve or adopt suitable textbooks therefor."

Defendant was familiar with that act. Its superintendent testified that he wrote the law. It authorized this defendant and other school boards to provide junior high schools, and directed the state board of education to prescribe the courses of study for such high schools and the regulations for teaching therein, and directed the state textbook commission to approve and adopt the textbooks therefor. Defendant, having already experimented somewhat with this type of school, voluntarily took advantage of this statute and remodeled its school structure so as to provide such high schools for all the white children of the city, but not for the colored children.

I am impressed with the thought that defendant cannot organize a type of high school, specifically authorized by statute, where the courses of study and regulations for teaching are directed and supervised by the state board of education, and then be heard to say it is not a high school, or be heard to say it is a high school for white children only. I therefore dissent from the rule stated in paragraph 2 of the syllabus.